785 So.2d 213 (2001)
STATE of Louisiana
v.
Louis GIBSON
No. 99-KA-2827.
Court of Appeal of Louisiana, Fourth Circuit.
April 11, 2001.
*214 Pamela S. Moran, Louisiana Appellate Project, New Orleans, Counsel for Defendant/Appellant.
Court composed of Chief Judge WILLIAM H. BYRNES III, Judge MIRIAM G. WALTZER, Judge MICHAEL E. KIRBY.
KIRBY, Judge.
On October 7, 1993, the defendant, Louis Gibson, was indicted for the first-degree murder of Latrone Davis. The defendant entered a plea of not guilty at his arraignment on October 29, 1993. Motion hearings were held. On July 5, 1995, the trial court denied defendant's motion to suppress identification. After a jury trial on July 10-14, 1995, the defendant was found guilty of second-degree murder. The defendant filed a motion for new trial on September 25, 1995. The trial court granted defendant's motion for a new trial on October 13, 1995. The State informed the trial court of its intent to seek supervisory writs of review. On September 4, 1996, this Court in writ 96-K-0455 reversed *215 the trial court's granting of the motion for new trial and remanded the matter. On October 24, 1996, the trial court sentenced the defendant to life imprisonment at hard labor without benefit of probation, parole or suspension of sentence. Defendant was granted an out of time appeal on September 8, 1999.

STATEMENT OF FACT
On March 18, 1993, around midnight, two vehicles had to stop at the corner of Treasure and Bruxelles Streets, near the End Zone Lounge because a Ford Bronco stopped in front of them. The first vehicle was driven by the deceased victim, Latrone Davis, who was accompanied by Christopher Everett, Terrence King and Brian Franklin. Cleveland Jiles drove the second vehicle, accompanied by Ronald Whitney, Tywan Barryhill, Adolph Scott and Gerald Barryhill. It was alleged that when the two vehicles were stopped, Louis Gibson came out and began rapidly firing his weapon at the occupied cars. Latrone Davis was fatally wounded, while Adolph Scott, Christopher Everett and Terrence King were all shot as well. No one in the two stopped vehicles had a gun.
Tywan Barryhill lived with his aunt, Paula Lawrence, in March of 1993 at 554 South Tonti Street. His cousin, Gerald Barryhill, lived there also. Tywan was in the residence when someone shot at the house on March 17, 1993. He did not see who shot up the house. However, he did see a vehicle approach the residence immediately before the shooting. Earlier that day, Gerald had an argument with Travis Epps when Gerald told Epps and his friends to stop loitering in front of his aunt's house. Ms. Lawrence did not want them sitting on her steps and selling drugs.
Tywan was with the victim when he was shot. Davis was in the vehicle ahead of his. As they were driving down Treasure Street, he noticed the defendant's vehicle by Popeye's Fried Chicken. A Ford Bronco stopped in front of Davis' vehicle, and Jiles stopped immediately behind Davis. The witness saw Patrick Campbell running and then observed the defendant, Louis Gibson, shooting at Davis' car. Gibson then ran toward Jiles' car and started shooting at them. Gerald jumped out of the car and started running. The witness told the police officers that the defendant was the person who shot at them. He also identified the defendant in a photographic lineup.
Gerald Barryhill testified that he fought with Travis Epps on March 17, 1993. Barryhill stated that Epps was selling drugs on his aunt's porch and he told Epps to leave. Epps left after they fought. About twenty-five minutes later, someone shot up his aunt's house. Barry-hill went with his friends to the End Zone Lounge in the early morning hours of March 18, 1993. He was one of the passengers in Cleveland Jiles' vehicle. When they arrived at the lounge, the witness saw the defendant come from behind a parked vehicle and shoot at Davis' vehicle. Barry-hill stated that the defendant was rapidly firing the weapon. The defendant then approached Jiles' car and started shooting at that car. Gerald jumped out of the vehicle and ran down the street. He took a cab home. The witness stated he saw Patrick Campbell in Gibson's car when the defendant first drove into the area. No one in his group had a weapon.
Kevin Whitney was a passenger in the victim's vehicle at the time of the incident. The victim, Latrone Davis, was driving. As they came to the intersection of Treasure and Bruxelles Streets, a truck stopped in front of them. The witness then noticed the defendant, Louis Gibson, stepped into the street and started shooting at their vehicle. After the shooting, a *216 police officer approached the vehicle and then called for assistance. No one in their vehicle had a weapon. The witness spoke with the homicide detectives and told them that the defendant shot the victim.
During the early evening hours of March 17, 1993, Ronald Whitney was walking down South Tonti Street when he saw Patrick Campbell talking to Louis Gibson, Miguel, Travis Epps and Corey Kelly. They were sitting in front of Campbell's house. Campbell then left with Louis Gibson in Gibson's vehicle. When Campbell and Gibson came back, the witness observed Campbell get out of a burgundy Oldsmobile Cutlass with a booksack and a gun in his hand. Gibson was the driver of the vehicle. The witness then saw Gibson, Campbell, Epps, Miguel and Kelly shoot up Paula Lawrence's house.
Later that evening, the witness was in the Jiles vehicle when the shooting at the End Zone Lounge occurred. The witness first observed the defendant's car in the parking lot of the Popeye's Fried Chicken on the corner of Paris and Treasure Streets. When Jiles' and Davis' vehicles approached the intersection of Treasure and Bruxelles Street, a truck stopped in front of them. The witness observed the defendant, Louis Gibson, walk from behind a parked vehicle and start shooting at the Davis vehicle. The defendant then approached Jiles' vehicle and started shooting at them. Adolph Scott was shot, and they took him to the hospital. The witness stated that he saw Patrick Campbell and Miguel standing near the defendant's car. The witness spoke with homicide detectives and informed them that the defendant was the perpetrator. Whitney also identified the defendant in a photographic lineup. The witness acknowledged a prior conviction for possession of a stolen vehicle.
Christopher Everett was in Davis' vehicle when the shooting occurred. Everett was shot in the leg. Everett testified that Davis was driving the vehicle. He was sitting behind Davis on the back seat. When they pulled up to the corner of Treasure and Bruxelles, the defendant, Louis Gibson, came from behind a parked vehicle and approached their vehicle. The defendant pulled a gun from his jacket and started shooting at them. The witness froze and then panicked. He knew the defendant prior to the shooting and identified the defendant in a photographic lineup. The witness was taken to Charity Hospital and spoke with a police officer while there. No one in his vehicle had a gun. The witness acknowledged prior convictions for carrying a concealed weapon and battery.
Terrence King was one the shooting victims on March 18, 1993. He was shot in the arm. King was a passenger in the Davis vehicle. They were driving on Treasure Street when they were stuck in a traffic jam. He then heard gunshots coming in the car. He saw a person with a jacket around his arm with a gun shooting. The witness ducked when the window glass broke and shattered in his face. After he ducked, it sounded like the shooting became closer and louder. Christopher and Latrone were shot. Latrone was in the driver's seat. Adolph Scott, a passenger in the Jiles vehicle, was also shot. The witness stated that he could not see the shooter's face. No one in the vehicle had a weapon. He believed he heard only one gun. The witness acknowledged prior convictions for carrying a concealed weapon and possession of cocaine.
Officer Dwayne Carkum was working a private detail inside the End Zone Lounge on March 18, 1993. The bar was extremely crowded. The officer heard several gunshots outside and went to investigate. *217 When he got outside, he saw a gray Buick near the intersection of Treasure and Bruxelles. Three men inside the vehicle were shot. The officer approached the vehicle. He did not see any weapons in the car. The officer called for an emergency medical unit and a district unit. One of the victims had a gunshot wound to his chest and did not look good. The officer did not speak with any witnesses on the scene.
At approximately 12:42 a.m. on March 18, 1993, Detective Louis Barrard responded to the call of a homicide at Bruxelles and Treasure Streets at the End Zone Lounge. Detectives Wesley Morris and Joseph Catalanotto accompanied the officer to the scene. When Officer Barrard arrived on the scene, he observed a vehicle that had been shot up. The victim, Latrone Davis, had been the driver of the vehicle. None of the victims was on the scene by the time the officer arrived, because they had been taken to Charity Hospital. Officer Carkum, who had been working a private detail at the lounge, was on the scene. A Fifth District officer, Officer Marshall, was also on the scene. Crime lab technicians were called to the scene. The officers found nine spent casings and two spent bullets on the scene. Three spent bullets were recovered from Mr. Davis' vehicle. One spent bullet was recovered from inside Mr. Jiles' vehicle. It appeared that only one weapon, a nine millimeter, was used in the shooting.
Detective Rumore went to Charity Hospital to check on the condition of the victims. About fifteen to twenty minutes later, Detective Rumore informed the officer that the case should be classified as a homicide. Detective Barrard met with the eyewitnesses and interviewed them at the homicide office. The officer also prepared a photographic lineup of possible suspects and presented the lineup to the witnesses. Kevin Whitney, Tywan Barryhill and Ronald Whitney identified the defendant as the perpetrator. Once the witnesses identified the defendant, a warrant for his arrest was prepared. Detective Rumore and Sergeant Steve Gaudet arrested the defendant on August 14, 1993. Officer Barrard later learned of a shooting which had occurred earlier on March 17, 1993 in the 500 block of South Tonti Street. The shooting occurred at Tywan Barryhill's aunt's house.
Paula Lawrence testified that on March 17, 1993, she resided at 554 South Tonti Street. When she arrived home from work at approximately 5:00 p.m., she noticed several guys, namely, Patrick Campbell, Louis Gibson, Miguel, and Travis Epps, who were standing near the corner of her house. She told her nephew, Gerald, to tell the boys to leave. She did not want them loitering in front of her house. Gerald told the subjects to leave. Ms. Lawrence then went to the grocery. When she returned, Gerald told her that he and Travis had gotten into a scuffle when he asked the guys to leave. Several minutes later, she heard gunshots. The shooting lasted about five minutes. The witness, her two younger children, Tywan Barryhill and Gerald Barryhill were in the house. After the shooting, she called the police. She moved out of the house that night. The witness testified that she did not know who shot up her house.
Officer Dwayne Marshall responded to the call of a shooting on South Tonti Street on March 17, 1993. When the officer and his partner, Michael Lyons, arrived on the scene, they observed a line of bullet holes going up the exterior of the house. The owners of the house showed the officers the bullet holes inside the house. Fortyfive caliber casings and nine-millimeter casings were found in front of the house. No arrests were made. One of the witnesses *218 mentioned seeing a blue Monte Carlo. In the early morning hours of March 18, 1993, the officer heard a dispatch of a shooting near the End Zone Lounge. He responded to the call and provided assistance.
Officer Henry Marshall also responded to the initial call concerning the shooting on Treasure and Bruxelles. He was called to the scene to write the incident report of the shooting. The officer spoke with several witnesses and observed one of the vehicles that been damaged by the shooting. Officer Marshall spoke with Adolph Scott at Charity Hospital. Scott stated he did not know who did the shooting.
Detective Wayne Rumore assisted in the homicide investigation. After learning of the shooting, he went to Charity Hospital to check on the victims' status. Four people had been shot, namely Terrence King, Christopher Everett, Adolph Scott and Latrone Davis. Shortly after arriving at the hospital, the officer was informed that Davis had died. The officer collected the clothing worn by the shooting victims as evidence and took it to the police department's Central Evidence and Property Room. At trial, the officer identified the clothing worn by Davis the night he was killed as well as the clothing worn by the other victims. The officer took verbal statements from the witnesses at the hospital and later interviewed Tywan Barryhill at the homicide office. The officer also participated in the defendant's arrest.
Dr. Frank Minyard, the Orleans Parish coroner, testified that the coroner's office classified the victim's death as a homicide. Dr. William Newman performed an autopsy on the victim on March 18, 1993. The parties stipulated that if Dr. Newman were called to testify, he would state that the victim sustained a fatal gunshot wound to the chest.
Officer Karl Palmer, a crime lab technician with the New Orleans Police Department Crime Lab, testified that he processed the homicide scene in the early morning hours of March 18, 1993. The officer photographed the scene and collected evidence. A co-worker sketched the scene. The officer collected six nine-millimeter casings from the street in the 1600 block Treasure Street. The officer also recovered three nine millimeter spent casings and one copper-jacketed lead pellet from the street at the intersection of Treasure and Bruxelles. He collected a black and white colored jacket and a red and white colored tee shirt from the front passenger seat of a 1998 Buick Park Avenue. He also found two spent bullets on the front left floorboard and two spent copper jacketed fragments and one lead fragment from the driver's door of the Park Avenue. The officer also photographed a green Cadillac on the scene. He recovered a spent bullet on the driver's side floorboard of the Cadillac. The photographs revealed approximately five bullet holes in the driver's door of the Park Avenue. The vehicle's driver side windows were shot out. The photographs also showed a bullet hole to the driver's door on the green Cadillac.
Officer Byron Winbush, firearms examination expert with the New Orleans Police Department Crime Lab, testified that he examined seven nine millimeter bullets, two copper jacket fragments, nine cartridge cases and two unknown caliber lead core fragments. The bullet casings were recovered from the scene of the shooting. One lead core fragment and one nine-millimeter bullet were recovered from the victim during the autopsy. His examination revealed that three bullets recovered from Davis' vehicle and the bullet and copper jacket covered from the victim were tired from the same weapon. Three other nine millimeter bullets recovered *219 from the scene and one copper jacket fragment recovered from the scene were recovered from the same weapon, but not the same weapon that fired the bullets found in Davis' vehicle and the copper jacket removed from the victim. The witness surmised that at least two weapons were used in the shooting. The other bullet fragments were unidentifiable.
Officer Keith Joseph testified that he was presently assigned to the narcotics division. Previously, he was a major crimes investigator in the First District. He stated that he had never been in the federal penitentiary. Officer Joseph further stated Officer Donald Barryhill was his partner when he was at the First District. The officer testified that he and his partner did not investigate the victim's death. They did locate and arrest one the suspects for whom the homicide detectives had issued arrest warrants. The witness is not related to Keith Johnson. The officer further stated that he believed that Officer Barryhill was related to Tywan Barryhill. The officer knew Tywan and Gerald Barryhill to be his partner's cousins.
Officer Clement Dison testified that on September 27, 1993, he responded to a call of a homicide at 552 South Tonti Street. When the officer and his partner, Brian Baily, arrived on the scene, they spoke with Chiquita Hensley and Tywan Barry-hill. The officers located the body of Corey Kelly in the residence. Rigor mortis had set in by the time the officers found the body.
Officer Shaheb Wali Muhammed testified that he was the father of Corey Kelly. On March 18, 1993, the officer was working in Juvenile Court when he received a phone call from the homicide division. Detective Barrard had left a message for the witness to call him. After speaking with Detective Barrard, the witness took his son, Corey, to see Detective Barrard. Corey, along with the defendant and Patrick Campbell, were charged with the murder of Latrone Davis. Corey was released after a preliminary hearing in Magistrate Court. The judge did not find probable cause to hold him. Campbell was later arrested but the charges were dropped against him also. The witness further stated that he was aware of the shooting which occurred on March 17, 1993 at the Barryhill residence on South Tonti Street. The officer conducted an investigation on his own of the shooting and gave his findings to Detective Barrard. On September 27, 1993, the witness's son, Corey, was killed. His body was found at 552 South Tonti Street. The officer identified his son's body and later spoke with Detective Caprera. He went with Detective Caprera to interview Tywan Barryhill and Gerald Barryhill. The officer obtained the name of a suspect, Ronald Whitney. Whitney was later arrested, however the charges were dropped. On the night that Latrone Davis was killed, Corey was at his sister's house babysitting his sister's children.

DISCUSSION

ASSIGNMENT OF ERROR NUMBER 1
In his first assignment of error, the defendant contends that trial court erred when it allowed the State to introduce other crimes evidence at trial. Specifically, the defendant complains that the trial court allowed the State to introduce testimony concerning a "shoot-up" of the Barryhills' residence several hours before the victim's death. After a hearing on the issue, the trial court stated that it would allow testimony concerning the incident to be admitted into evidence as it was probative of the defendant's intent, knowledge and system.
In State v. Miller, 98-0301 (La.9/9/98), 718 So.2d 960, the Louisiana *220 Supreme Court set out the applicable law pertaining to the admissibility of other acts by a defendant, stating:
Article 404(B) of the Louisiana Code of Evidence provides the basic rule regarding the use of evidence of "other crimes, wrongs or acts" at trial. It states in pertinent part:
(1) Except as provided in Article 412 [regarding a victim's past sexual behavior in sexual assault cases], evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident.
Several other statutory and jurisprudential rules also play a role in determining the admissibility of such evidence. First, one of the factors listed in Article 404(B) "must be at issue, have some independent relevance, or be an element of the crime charged in order for the evidence to be admissible." State v. Jackson, 625 So.2d 146, 149 (La.1993). Second, the state is required to prove the defendant committed these other acts by clear and convincing evidence. Id.; State v. Davis, 449 So.2d 466 (La.1984). Third, even if independently relevant, the evidence may be excluded if its probative value is substantially outweighed by the dangers of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time. La. C.E. art. 403. Finally, the requirements set forth in State v. Prieur, 277 So.2d 126 (La.1973) must be met. Thereunder, the state must, within a reasonable time before trial, provide written notice of its intent to use other acts or crimes evidence and describe these acts in sufficient detail. The state must show the evidence is neither repetitive nor cumulative, and is not being introduced to show the defendant is of bad character. Further, the court must, at the request of the defendant, offer a limiting instruction to the jury at the time the evidence is introduced. The court must also charge the jury at the close of the trial that the other crimes evidence serves a limited purpose and that the defendant cannot be convicted for any crime other than the one charged or any offense responsive to it.
98-0301 at pp. 3-4, 718 So.2d at 962. A trial court's ruling on the admissibility of evidence pursuant to La. C.E. art. 404(B)(1) will not be disturbed absent an abuse of discretion. See State v. Stepp, 28,868, p. 4 (La.App. 2 Cir. 12/11/96), 686 So.2d 76, 79, writ denied, 97-0410 (La.6/30/97), 696 So.2d 1006.
In the present case, the defendant produced the first evidence of the shooting. During cross-examination by the defendant, Officer Barrard was asked to read the following information from a supplemental police report:
According to the witnesses, there had been a fight earlier between Gerald Barryhill and Travis Epps. Later on, that same day Louis Gibson, Patrick Campbell, Corey Kelly, Travis Epps, and another subject known only as Miguel passed by Barryhill's aunt's house located at 554 South Tonti Street and all the subjects supposedly fired at the house with guns. This incident was reported under police item C (Charlie) 27474-93. And according to the printout obtained from communications it occurred on March 18, 1993, at about 7:30 p.m. Was handled by car 106.
The defendant also attempted to elicit information about this shooting during his cross-examination of Christopher Everett. *221 The witness stated that he was not present at the Barryhill residence when the shooting took place. He heard that Gerald Barryhill and Tywan Barryhill were there at the time of the shooting. He later learned that someone by the name of Miguel was shot.
The State then called Paula Lawrence who testified that on March 17, 1993, she resided at 554 South Tonti Street. When she arrived home from work at approximately 5:00 p.m., she noticed several guys, namely, Patrick Campbell, Louis Gibson, Miguel, and Travis Epps, standing near the corner of her house. She told her nephew, Gerald, to tell the boys to leave because she did not want them loitering in front of her house. Gerald told the subjects to leave. Ms. Lawrence then went to the grocery. When she returned, Gerald told her that he and Travis had gotten into a scuffle when he asked the guys to leave. Several minutes later, she heard gunshots. The shooting lasted about five minutes. The witness stated that she did not know who shot up her house.
Tywan Barryhill also testified about the shooting. He stated that he did not see who shot up the house. However, he did see a vehicle approach the residence immediately before the shooting. Earlier that day, Gerald had an argument with Travis Epps when Gerald told Epps and his friends to stop loitering in front of his aunt's house. Ms. Lawrence did not want them sitting on her steps and selling drugs. Gerald Barryhill testified that he fought with Travis Epps on March 17, 1993. Barryhill stated that Epps was selling drugs on his aunt's porch and he told Epps to leave. Epps left after they fought. About twenty-five minutes later, someone shot up his aunt's house.
During the early evening hours of March 17, 1993, Ronald Whitney was walking down South Tonti Street when he saw Patrick Campbell talking to Louis Gibson, Miguel, Travis Epps and Corey Kelly. They were sitting in front of Campbell's house. Campbell then left with Louis Gibson in Gibson's vehicle. When Campbell and Gibson came back, the witness observed Campbell get out of a burgundy Oldsmobile Cutlass with a booksack and a gun in his hand. Gibson was the driver of the vehicle. The witness then saw Gibson, Campbell, Epps, Miguel and Kelly shoot up Paula Lawrence's house.
In addition, the defendant produced the testimony of a police officer who responded to the call from 554 South Tonti Street. Officer Dwayne Marshall stated that when he and his partner arrived on the scene, they observed a line of bullet holes going up the exterior of the house. The owners of the house showed the officers the bullet holes inside the house. Forty-five caliber casings and nine-millimeter casings were found in front of the house. No arrests were made in the case.
The testimony elicited about the shooting clearly indicates the defendant's involvement in the incident. According to Ronald Whitney, an eyewitness to the shooting of the residence, Gibson was the driver of vehicle and provided Campbell with a weapon. As the trial court noted, the residence shooting was closely intertwined with the shooting which resulted in the murder of Latrone Davis. The apparent motive for the drive by shooting of the residence and the shooting later that night at the End Zone Lounge arose from the earlier altercation between Gerald Barry-hill and Travis Epps and his friends. Further, both shootings were unprovoked and surprise attacks on unarmed victims. In addition, the testimony was not introduced to show the defendant's bad character. As the trial court noted, it was introduced to show motive, intent, knowledge and system. Accordingly, the trial court did not *222 abuse its discretion in allowing the testimony into evidence.
This assignment is without merit.

ASSIGNMENT OF ERROR NUMBER 2
The defendant further argues that the trial court should have required the State to provide him with "rap sheets" for the State witnesses. The defendant sought the rap sheets so that he would have information to impeach the credibility of the witnesses. The record reveals that the trial court initially denied the defendant's request for rap sheets of the State's witnesses. Later, the trial court ordered the State to produce the rap sheets for an in camera inspection. The trial court reviewed the rap sheets, found that three of the State's witnesses had prior convictions and ordered the State to produce certified copies of the convictions.[1] The State acknowledged at trial that it had a duty to provide the defendant with certified copies of convictions of its witnesses and provided the documents to the defendant prior to trial. In addition to these documents, the defendant wanted the rap sheets for two witnesses who did not have any prior convictions. The trial court refused to order the State to produce rap sheets for these witnesses.[2]
The trial court correctly denied the defendant's request. La. C.E. article 609.1 provides that "only offenses for which the witness has been convicted are admissible upon the issue of his credibility, and no inquiry is permitted into the matters for which there has only been an arrest."
This assignment is without merit.

ASSIGNMENT OF ERROR NUMBER 3
Lastly, the defendant contends that the trial court erred in failing to protect the record and in failing to ensure the availability of all transcripts for appellate review. Specifically, the defendant complains that he is prejudiced by lack of transcripts for the suppression hearing held on February 28, 1994 and the sentencing hearing held on October 24, 1996.
La. Const. art. I, § 19 (1974), provides, in pertinent part: "No person shall be subjected to imprisonment or forfeiture of rights or property without the right of judicial review based upon a complete record of all evidence upon which the judgment is based." Furthermore, La.C.Cr.P. art. 843 requires that all proceedings in felony cases be recorded, including the testimony of witnesses.
In State v. Ford, 338 So.2d 107 (La. 1976), the court stated:
Without a complete record from which a transcript for appeal may be prepared, a defendant's right of appellate review is rendered meaningless. A slight inaccuracy in a record or an inconsequential omission from it which is immaterial to a proper determination of the appeal would not cause us to reverse defendant's conviction. But where a defendant's attorney is unable, through no fault of his own, to review a substantial portion of the trial record for errors so that he may properly perform his duty as appellate counsel, the interests of justice require that a defendant be afforded a new, fully-recorded trial.
338 So.2d at 110.
However, courts have consistently held that a complete appellate review of *223 a defendant's conviction and sentence can be accomplished even when there are missing portions of the trial record. See State v. Lucky, 96-1687 (La.4/13/99), 755 So.2d 845, cert. denied, Lucky v. Louisiana, 529 U.S. 1023, 120 S.Ct. 1429, 146 L.Ed.2d 319 (2000); State v. Cooley, 98-0576 (La.App. 4 Cir. 2/2/99), 747 So.2d 1182. Further, where the record includes a complete transcript of the evidentiary portion of the trial, the appellant's "constitutional right to a judicial review of all evidence" has not been compromised. State v. Thomas, 92-1428 (La.App. 4 Cir. 5/26/94), 637 So.2d 1272, writ denied, 94-1725 (La.11/18/94), 646 So.2d 376, cert. denied, Thomas v. Louisiana, 514 U.S. 1054, 115 S.Ct. 1437, 131 L.Ed.2d 317 (1995). As to other untranscribed portions of the record, where there were no contemporaneous objections, the errors were not preserved for appeal. State v. Harrison, 627 So.2d 231, 233 (La.App. 4 Cir.1993).
Defendant has not suffered any prejudice from the lack of a sentencing transcript as the defendant was sentenced to the mandatory sentence required under La. R.S. 14:30.1. Further, the minute entry of the sentencing hearing indicates the defendant was present at the hearing and represented at counsel. The entries also reveal that the defendant did not object to the sentence or file a motion to reconsider sentence. Therefore, any sentencing issue was not preserved for appeal.
Likewise, it does not appear that the defendant was prejudiced by the lack of a transcript for the suppression hearing held on February 24, 1994. The docket master and minute entry for that date indicates that Officer Louis Barrard was the only person to testify at the hearing which concerned the defendant's motion to suppress identification. Officer Barrard testified extensively at trial concerning the photographic identification process used in the case and the photographic identifications made by Kevin Whitney, Tywan Barryhill and Ronald Whitney. Further, the record includes the transcript of the suppression hearings held on December 13-14, 1995 at which Kevin Whitney, Tywan Barryhill and Ronald Whitney testified.
Therefore, this assignment is without merit.

CONCLUSION
Accordingly, the defendant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] Witnesses King, Everett and Whitney each had at least one prior conviction. The State provided defendant with documentation of these convictions.
[2] However, the defendant apparently obtained the rap sheet for the witnesses as defense counsel questioned the witnesses about their arrests.