JAMES F. McKAY III, Chief Judge.
hThe defendant Daniel Gordon was convicted on Counts 1 and 3 of aggravated *761 rape and convicted on Count 4 of simple robbery. Finding three patent errors, but no merit to either of the defendant’s two assignments of error, the defendant’s convictions are affirmed; his sentence as to Count 1 is affirmed; his sentence as to Count 4, as a second felony habitual offender is amended to delete the restriction that it be served without the benefit of parole; the additional habitual offender sentence that defendant be treated with medroxyprogesterone acetate (“chemically castrated”) for the rest of his life as per La. R.S. 14:43.6 is deleted; and the case is remanded for sentencing as to the aggravated rape conviction in Count 3.
STATEMENT OF THE CASE
The defendant Daniel Gordon was charged by grand jury indictment on June 10, 2010, in Counts 1 and 3 with aggravated rape, violations of La. R.S. 14:42, and in Counts 2 and 4 with simple robbery, violations of La. R.S. 14:65. The defendant pleaded not guilty to all counts at his June 21, 2010 arraignment. On December 14, 2010, the trial court granted the State’s Prieur[1] motion to introduce I ¿evidence of prior similar crimes. Trial before a twelve-person jury was held on January 5-7, 2011, at the conclusion of which the defendant was found guilty as charged as to Counts 1, 3, and 4, and not guilty as to Count 2.
The trial court denied the defendant’s motion for a new trial on February 11, 2011. On April 1, 2011, the trial court sentenced the defendant on Count 1 to life imprisonment at hard labor, without the benefit of parole, probation, or suspension of sentence, and on Count 4 to seven years at hard labor, all sentences to run concurrently. On that same date, the defendant was adjudicated a second-felony habitual offender as to Count 4. His sentence on Count 4 was vacated, and he was sentenced to fourteen years at hard labor, without the benefit of parole, probation, or suspension of sentence, to run concurrently with the sentence in Count 1. On that date, the trial court also sentenced the defendant under La. R.S. 14:43.6(B)(1) to treatment with medroxyprogesterone acetate (“chemical castration”) for the rest of his life. On February 1, 2013, the trial court granted the defendant’s motion for appeal.
FACTS
The defendant was convicted in Count 1 of the October 17, 1996 aggravated rape of L.A. and in Counts 3 and 4 of the May 12, 1997 aggravated rape and simple robbery of D.B.
L.A., then fifty-five years old, testified that on the date she was assaulted, she was working as a banquet waitress at the Hilton Hotel. She got off of work before 1:00 p.m. and went home. She later sat outside in her neighborhood, but away from her residence, socializing with friends for approximately four hours. She drank four or five beers, starting before dark. A male, who was a stranger to her but knew one of her male friends, was present. L.A. testified that when she left [¡¡to walk around the corner back to her residence, the same male came up behind her and asked for a cigarette, before wrapping a cord or rope around her neck. They were on Louisiana Avenue, between Dryades and Baronne Streets. He told her that she “better not holler.” He pulled her by the cord underneath a house and raped her. He told her “If you scream, I’m going to kill you.” He then pulled the cord tight. She said she acted like she was dead, just lying there, and he left.
L.A. said that afterward, she went home to 3430 Baronne Street, put on some *762 clothes, and telephoned the police from the corner of Louisiana and Baronne Streets. The police took her to Charity Hospital where she was examined and DNA was taken. L.A. identified a handwritten statement that she gave the police describing what happened. She identified the defendant in the courtroom as the person who had raped her that night, admitting that he did not look the same fourteen years later, and saying at one point that “[h]e looks very familiar.” L.A. replied in the negative when asked on cross examination whether she had resisted her attacker.
Retired New Orleans Police Department (“NOPD”) Officer Edward Guy (“Officer Guy”) investigated a rape that took place on October 17, 1996. He identified an incident report he submitted under item #J-25782-96. He testified that he was dispatched to a possible rape in the 1800 block of Louisiana Avenue. He took the victim to the hospital and arranged for her to have a sexual assault examination. He said the report indicated that a sexual assault kit taken in the case was logged in NOPD Central Evidence and Property. He identified the victim’s handwritten statement. He also identified a map of an area showing the 1800 block of Louisiana Avenue, between Dryades and Baronne Streets. He identified photographs he had taken the week of trial in the 1800 block of Louisiana Avenue. LHe recalled that a piece of nylon cord approximately forty-nine inches in length was collected as evidence in the case. He did not remember seeing any injuries to the victim’s neck consistent with having a cord or rope wrapped around it. He confirmed that the address of the residence under which the rape occurred was 1834 Louisiana Avenue. He recalled that the rape occurred between 2:00 a.m. and 2:30 a.m.
D.B. testified that, in 1997, she was forty-eight years old and resided at Second and Danneel Streets. She was raped on Mother’s Day night in 1997. She had gone to a bar at the corner of Second and Danneel Streets, “Big Time Crypts.” She said she left that bar and was walking to another corner bar when the defendant came up behind her, slammed her up against a truck, and began choking her such that she could hardly breathe. He then threw her down to the ground, breaking her arm. He dragged her across a lot and raped her. She knew the defendant because his mother-in-law used to have a bar at Second and Danneel Streets that she frequented. She identified the defendant in court as her attacker. During the course of the rape, he took five dollars from her. The victim was taken to the hospital where a cast was placed on her arm and a DNA sample and/or PAP smear was taken. The victim admitted to having one prior felony conviction for possession of cocaine for which she had been given probation.
NOPD Lieutenant Joseph Lorenzo testified that he had investigated a rape that occurred on May 12, 1997. The crime scene was a vacant lot in the 1900 block of Dryades Street. He identified a copy of the incident report he completed under item # E-19528-97. The victim sustained what was later determined to be a fractured arm. Her clothes were disheveled, and she had some mud and debris on them. She was a little intoxicated, in pain, and she had a contusion under her left 15eye. A sexual assault examination was conducted at Charity Hospital and a rape kit was collected by him and taken to NOPD Central Evidence and Property. Lieutenant Lorenzo identified a receipt he received in exchange for the rape kit.
Scott Resweber, M.D., was a resident emergency room physician at Charity Hospital from July 1993 to June 1997. He performed a sexual assault examination on *763 D.B. He identified his report of the examination, under NOPD item # E-19528-97, from May 12, 1997. Dr. Resweber described his examination of D.B. He described a dislocation of her left elbow and a contusion on her cheek below her left eye; there was no trauma to the victim’s neck, or bruising or tearing of the vagina.
Patricia Daniels testified that she was a medical technologist employed by the Orleans Parish Coroner’s Office from 1950 through 2000. She testified that for all of those years she had performed all analyses for bodily fluids in rape cases. She identified her report in D.B.’s case, under NOPD item # E-19528-97. She testified that an internal vaginal swab was positive for seminal fluid, while the external swab was negative. Both internal and external vaginal swabs were negative for spermatozoa. A blood sample was typed for Group A.
Retired NOPD Detective Dennis DeJe-an (“Detective DeJean”) testified that on September 7, 1993, he investigated a rape at Second and Danneel Streets. The victim, N.H., was present with her cousin and other officers when he arrived. A suspect, Daniel Gordon, had been detained. He identified his police report in the case, under item # 1-9982-93, and the booking sheet for the incident, reflecting that the Daniel Gordon arrested had a date of birth of March 12,1955. He testified that, while he was advising the defendant of his rights the defendant blurted out that he had sex with the victim, but that it was about “dope.” He confirmed that 16the defendant had previously been arrested for aggravated rape and crime against nature for the assault of N.H. The victim of that crime was transported to Charity Hospital where she underwent a sexual assault examination. He identified the report of the medical examination in the case, and a receipt from NOPD Central Evidence and Property for the sexual assault kit under item # 1-9982-93. He identified a crime lab technician’s report in the case.
NOPD Officer Ronald Thomas testified that on September 7, 1993, he was dispatched to 2421 Danneel Street on an aggravated rape call involving the victim N.H. Officer Thomas identified the defendant as the person he had detained for the crime, under NOPD item # 1-982-93.
N.H. testified that on September 7, 1993, she was living with her cousin in New Orleans, when she was raped and forced to perform oral sex at a location on Danneel Street. She and her cousin had been at “Crypts” club dancing and socializing. They went outside to a nearby alley and sat on some steps. The defendant walked up and asked them what they were doing. N.H.’s cousin had seen the defendant before. N.H. said the man was called “Danny.” The two women got up to walk away, and he picked up a sharp object from the ground and held it to N.H.’s throat. He told the cousin that she better get out of there or she would “get some of this,” and the cousin left. The defendant then raped and assaulted N.H. Afterward, N.H. sat down until the defendant walked away, and then she walked down the street to telephone the police. The defendant had gone to sit on some nearby steps where he was arrested. N.H. underwent a sexual assault examination at the hospital.
17Loretta Pierre, N.H.’s first cousin, corroborated the testimony of N.H. She identified the defendant in court as looking like the perpetrator. Ms. Pierre admitted having a prior misdemeanor drug conviction.
NOPD Detective Michael McCleery testified that in 2005 he was assigned to the sex crimes division, and that he conducted a follow-up investigation in a 1996 rape case, under NOPD item # J-25782-96, involving victim L.A. Information had been received of a DNA computer match indi- *764 eating that Daniel Gordon was the perpetrator of the rape in that case. After speaking with L.A., he obtained an arrest warrant for the defendant on May 27, 2005. He recalled that the defendant had been convicted in 1971 of an attempted rape. On redirect examination, Detective McCleery identified an internal investigative lead letter for the case, essentially showing that the samples from the 1996 rape kit under item # J-25782-96 matched a known person named Daniel Gordon.
NOPD Officer Lucretia Gantner testified that she arrested the defendant on February 10, 2010. It was stipulated that he was arrested that date while in the 1800 block of Louisiana Avenue, on the outstanding warrant put out by Detective McCleery.
NOPD Detective Akron Davis testified that he obtained a search warrant and obtained a buccal swab from the defendant on March 19, 2010. Detective Davis sealed it in an envelope and took it straight to the property room. The detective identified the search warrant and the receipt from the NOPD Central Evidence and Property room.
Retired NOPD Detective Ronald Puigh (“Detective Puigh”) testified that, during his tenor with the NOPD, he had been assigned to the sex crimes division for approximately six of his twenty-eight and one-half years. He testified that | swhile he was an investigator with the Orleans Parish District Attorney’s Office, he was assigned to the district attorney’s sex crimes case management section. At the request of the assistant district attorneys he worked for, he picked up a buccal swab from NOPD Central Property and Evidence under items # J-25782-96 and # E-19528-97, and transported it to the Louisiana State Police Crime Lab in Baton Rouge. He identified an NOPD receipt showing the release to him on May 10, 2010, of one buccal swab collected from Daniel Gordon. He identified a State Police request for scientific analysis of the buccal swab, reflecting that the swab was submitted on the afternoon of May 10, 2010.
Gina Pineda, was qualified by stipulation as an expert in the field of molecular biology and DNA analysis. Ms. Pineda explained the DNA analysis procedure for the jury. She identified two Reliagene Technologies (“Reliagene”)[2] reports sent to the NOPD relative to DNA testing/anal-yses done on vaginal swabs and victim blood samples and enlargements therefrom, one dated September 12, 2003, reference card submitted to it under NOPD item # E-l9528-97, the other dated October 23, 2003, under NOPD item #J-25782-96. She confirmed that the DNA of the sperm donors from the cases under NOPD items # E-19528-97 and # J25782-96 coincided with each other.
Anne H. Montgomery, was qualified by stipulation as an expert in the field of molecular biology and DNA analysis. Ms. Montgomery explained for the jury that local accredited DNA labs that are part of the Local DNA Index System (LDIS) upload DNA analysis results/profiles into their respective State DNA Index Systems (SDIS) — operated in Louisiana by the State Police — which in turn 19uploads those results/profiles into the National DNA Index System (NDIS). The entire system was referred to as the Combined DNA Index System (CODIS).
Ms. Montgomery testified that, although the NOPD had an LDIS-aecredited lab prior to Hurricane Katrina, when the federal government made available grant *765 money to process backlogged evidence for DNA, the Louisiana State Police approved a vendor lab to do DNA testing for the NOPD, which, in the case of the instant “cold case,” was Reliagene. The NOPD Crime Lab sent its evidence to Reliagene, and when the DNA analysis and testing was completed, Reliagene returned the evidence to the NOPD. The NOPD Crime Lab would review the Reliagene data and all of the lab files and documents to make sure Reliagene’s controls were appropriate and that the procedures it followed were in accordance with the applicable standards. Then the NOPD Crime Lab would upload the data into the LDIS computer and transmit it. Ms. Montgomery confirmed that the above procedure was followed with the evidence in the NOPD cases under items # E-19528-97 and # J-25782-96, and the data was eventually uploaded into the national DNA database, the NDIS.
Ms. Montgomery testified that the NOPD Crime Lab got “hit” letters from the NDIS on the DNA profiles uploaded in NOPD cases under both NOPD items # E-19528-97 and # J-25782-96, indicating that the DNA profiles generated by the Reliagene testing matched each other and the defendant. She said the NOPD Crime Lab then issued an investigative lead letter that resulted in the issuance of a search warrant for the taking of the buccal swab from the defendant. This was the swab taken from the defendant by Detective Akron Davis on March 19, 2010. Detective Puigh deposited this buccal swab with the Louisiana State Police, on May 10, 2010. Ms. Montgomery testified that the State Police Crime Lab derived |ina male DNA profile from that buccal swab and compared it to the DNA profiles in the cases under NOPD items # E-19528-97 and # J-25782-96. She reviewed the State Police Crime Lab report generated by Mollie Bride and concurred with her conclusion that, based on the DNA derived from the defendant’s March 2010 buccal swab, he could not be excluded as the contributor of the DNA in the cases under NOPD items # E-19528-97 and #J-25782-96.
Mollie Bride, was qualified by stipulation as an expert in the field of DNA analysis. Ms. Bride testified that she was formerly employed by the Louisiana State Police Crime Lab. She testified that in the instant case a male DNA profile was derived from the buccal swab from defendant. She compared that DNA profile to the DNA profiles derived in the cases under NOPD items # E-19528-97 and #J-25782-96. As to the DNA profile from # E-19528-97, she testified that, based on the victim being a black female, it was 887 billion times more likely that the DNA obtained from the evidence from # E-19528-97 was a mixture of the defendant’s DNA and the victim’s DNA than a mixture from the victim and a random person.
As to the DNA profile from # J-25782-96, Ms. Bride testified that, based on the victim being a black female, it was 17.2 trillion times more likely that the DNA obtained from the evidence in # J-25782-96 was a mixture of the defendant’s DNA and the victim’s DNA than a mixture from the victim and a random person.
The defendant Daniel Gordon testified in his own behalf. The defendant testified that he had entered into a plea bargain with the State in 1971 wherein he had pleaded guilty to attempted aggravated rape. He said he was sixteen years old in 1971 when he acted as a lookout for some adults, who were still in their teens, that had robbed a bar. The adults were apparently charged with aggravated rape.
|T1The defendant maintained that he did not rape anyone in 1993. As to the allegation concerning the 1996 rape, the defen *766 dant testified that he had been released from the penitentiary in California after having served fourteen years, and upon his return to New Orleans became involved in the selling of rock cocaine on a small-scale. According to the defendant, during that time he traded cocaine for sex. He said he did not remember the victim in the 1996 case, who would have been L.A., but said at no time did he rape anyone. As for the victim in the 1997 case, D.B., the defendant said he was doing the same thing— meaning, trading cocaine for sex. He also stated that for part of 1997 he was incarcerated in California. He admitted that before his release from the California prison in 1998; a swab was taken from him for the national DNA database.
The defendant confirmed on cross examination that he was in New Orleans at some point in 1997. He confirmed that the 1971 case in which he pleaded guilty at age sixteen involved a rape and robbery. He said he served fourteen years in prison for his conviction in that case. He had two prior felony convictions in California, one for aggravated assault with a knife; the other, in 2002, for battery of a spouse. As for his testimony that he traded cocaine for sex in 1996, he said that, although he was not admitting that he had sex with anyone, if he had sex with anyone during that period it was more than likely in a crack house/hotel somewhere. He questioned why he would want to rape anyone when he had women falling all over his feet because he had crack cocaine. He admitted that he had sold drugs in the area where the rapes allegedly occurred, and that he had frequently visited that area.
The defendant said that if his DNA had been found on the victims, then the sex must have been consensual because that was all he “mess with.” He said he 1 ^messed with women that smoked dope. He claimed that he sometimes had sex with women and instead of giving them a rock of crack cocaine, he had given them a rock he picked up off the ground, and that consequently “a whole bunch of them done got mad at me.” The defendant said he did not know any of the women who testified against him at trial.
ERRORS PATENT
A review of the record reveals three errors patent on the face of the record.
First, the sentencing transcript reflects that the trial court failed to sentence the defendant as to Count 3, one of the two convictions for aggravated rape. While the minute entry reflects that the trial court imposed the mandatory life sentence, without the benefit of parole, probation, or suspension of sentence as to this conviction, in cases of a discrepancy between a minute entry and the sentencing transcript, the transcript controls. State v. Galle, 2011-0930, p. 30 (La.App. 4 Cir. 2/13/13), 107 So.3d 916, 934, writ denied, 2013-0752 (La.10/30/13), 124 So.3d 1102, 2013-0561 (La.11/1/13), 124 So.3d 1107; State v. Randall, 2010-1027, p. 3 (La.App. 4 Cir. 6/22/11), 69 So.3d 683, 685. Therefore, we remand the case for sentencing on the conviction in Count 3.
In the second patent error, when sentencing the defendant as a second-felony habitual offender to fourteen years at hard labor on Count 4, the conviction for simple robbery, the trial court stipulated that the sentence be served without the benefit of parole, probation, or suspension of sentence. However, La. R.S. 14:65, the simple robbery statute, does not provide for any of those sentencing restrictions. Subsection G of the Habitual Offender Law, La. R.S. 15:529.1, provides that any sentence imposed under that statute shall be without the benefit of probation or suspension of sentence, but contains no re *767 striction as to parole. | i ¡/There is no authority for denying the benefit of parole to a defendant sentenced as a second-felony habitual offender on a conviction for simple robbery. Accordingly, the defendant’s sentence as to Count 4 is amended to delete that restriction.
As to the third error patent, the trial court ordered, based on one or both of the defendant’s convictions for aggravated rape, that he be treated with medroxy-progesterone acetate (MPA) (“chemical castration”) according to a schedule of administration to be monitored by the Department of Public Safety and Corrections, in accordance with La. R.S. 14:43.6. However, La. R.S. 14:43.6 was enacted in 2008, being added by Acts 2008, No. 441, § 1, eff. June 25, 2008. The defendant’s two convictions in the instant case for aggravated rape were for offenses allegedly committed in 1996 and 1997, respectively.
La. R.S. 1:2 provides: “No Section of the Revised Statutes is retroactive unless it is expressly so stated.” However, La. R.S. 1:2 “has been construed as coextensive with” La. C.C. art. 6. St. Paul Fire & Marine, Ins. Co. v. Smith, 609 So.2d 809, 816 (La.1992). La. C.C. art. 6 states:
In the absence of contrary legislative expression, substantive laws apply prospectively only. Procedural and interpretative laws apply both prospectively and retroactively, unless there is a legislative expression to the contrary.
In State v. Washington, 2002-2196, (La.9/13/02), 830 So.2d 288, the Louisiana Supreme Court — not even mentioning La. R.S. 1:2 — relied on La. C.C. art. 6 to determine whether an amended provision of the Louisiana Criminal Code should be applied retroactively. A two-fold inquiry is required by La. C.C. art. 6 in deciding whether a law should be applied retroactively. It must first be ascertained whether the enactment expresses legislative intent regarding retrospective or | ^prospective application. If such intent is expressed, the inquiry ends. Washington, 2002-2196, p. 2, 830 So.2d at 290.
In the instant case, neither La. R.S. 14:43.6 nor its enacting legislation evidences any legislative intent with regard to whether the statute is to be applied retroactively or prospectively. Therefore, the necessary second step in the analysis is to classify the enactment as either substantive, procedural, or interpretive. Id.
Substantive laws are laws that impose new duties, obligations or responsibilities upon parties, or laws that establish new rules, rights and duties or change existing ones. Interpretive laws are those which clarify the meaning of a statute and are deemed to relate back to the time that the law was originally enacted. Procedural laws prescribe a method for enforcing a substantive right and relate to the form of the proceeding or the operation of laws.
Washington, 2002-2196, p. 3, 830 So.2d at 290, quoting Jacobs v. City of Bunkie, 98-2510, p. 8 (La.5/18/99), 737 So.2d 14, 20.
Clearly, La. R.S. 14:43.6, providing in some cases, including in the defendant’s (having been convicted of two aggravated rapes), for mandatory “chemical castration” for life, is not an interpretive or a procedural law. It can only be categorized as a substantive law. As such, it cannot be applied retroactively.
 Further, the retroactive application of La. R.S. 14:43.6 would be unconstitutional as violative of Art. I, § 10 of the United States Constitution and La. Const, art. I, § 23, both of which prohibit ex post facto application of criminal laws by the State. Smith v. State, 2010-1140, p. 15 (La.1/24/12), 84 So.3d 487, 497. The focus of the ex post facto inquiry is whether a new law redefines criminal conduct or in *768 creases the penalty by which the crime is punishable. Id.; State v. Williams, 2000-1725, p. 5 (La.11/28/01), 800 So.2d 790, 795.
In State ex rel. Olivieri, 2000-0172 (La.2/21/01), 779 So.2d 785, the Louisiana Supreme Court held that retroactive application of the sex offender | ^registration and notification requirements of Louisiana’s “Megan’s Law,” encompassed in three interrelated statutory provisions, La. R.S. 15:542, La. R.S. 15:574.4(H)(2), and La.C.Cr.P. art. 895(H), to defendants convicted of qualifying sex offenses perpetrated prior to the enactment of the law(s), did not violate the ex post facto provisions. The defendants in the two consolidated cases in Olivieri argued that various requirements and provisions of the three statutes, such as the burden and cost of notification, the community notification requirement and the other notice which could be required, i.e., signs, handbills, bumper stickers, or labeled clothing, constituted punishment. The court conceded the harshness of the provisions. The court also recognized that in fact the registration provision did provide for punishment for failing to register, but it noted that this was a separate offense, not an additional punishment for the sex offenses. The court held that the effect of the interrelated components of this legislation was not so obtrusive that it would find it punitive— rather than remedial or regulatory as was the intention of the Legislature — and it further held that the legislation did not violate., the constitutional prohibition against the enactment of ex post facto laws.
Unlike the sex offender registration statutes at issue in Olivieri, La. R.S. 14:43.6 provides for a “sentence” of “chemical castration” for a set number of years, up to the remainder of the offender’s natural life, the latter being the sentence imposed in the instant case. It cannot reasonably be argued that requiring an offender to submit to pharmaceutical injections to render him impotent for the remainder of his life does not amount to punishment. Thus, application of La. R.S. 14:43.6 to defendant violates the ex post facto provisions of the Louisiana and federal constitutions.
| ifiIn an unpublished decision, State v. Nicholson, unpub., 2011-0883 (La.App. 4 Cir. 12/5/12), 2012 WL 6619019, the defendant was convicted of aggravated rape and sentenced to mandatory life imprisonment at hard labor, without the benefit of parole, probation, or suspension of sentence. He also was sentenced to “chemical castration” pursuant to La. R.S. 14:43.6. He argued that because La. R.S. 14:43.6 was not in effect at the time he committed the offenses in 1991 and 1994, it was not applicable to his case. This court noted that La. R.S. 14:43.6(C)(2) provides that “[i]n all cases involving a defendant sentenced to a period of incarceration or confinement in an institution, the administration of treatment with medroxyprogesterone acetate (MPA) shall commence not later than one week prior to the defendant’s release from prison or such institution.” (Emphasis supplied). This Court reasoned that, because the defendant had been sentenced to life imprisonment without the benefit of parole, “the issue of chemical castration and the applicability of La. R.S. 14:43.6, as a practical matter, are immaterial, and we pretermit discussions on these issues.” Nicholson, 2011-0883, p. 7, 2012 WL 6619019, at *14.
In State v. R.K, 2010-982 (La.App. 3 Cir. 5/11/11), 64 So.3d 426, after sentencing the defendant on each of two convictions for aggravated rape to mandatory life imprisonment at hard labor, without benefit parole, probation, or suspension of sentence, the trial court stated that in the event the defendant would become eligible *769 for parole, it was also ordering that he be subject to La. R.S. 14:48.6. The court said that if the defendant became eligible for parole it would appoint a medical officer to make the statutorily-required determination as to whether he was medically fit for such treatment. La. R.S. 14:4S.6(C)(1). On appeal, the court noted as an error patent that La. R.S. 14:48.6 was not in effect in |172005 when the defendant committed the two aggravated rapes for which he was convicted and sentenced. Citing La. R.S. 1:2, the court deleted that part of the defendant’s sentence. The court additionally held that because the power to regulate one on parole was vested in a parole board, the trial court lacked the authority to impose “chemical castration” as a future condition of parole.
In the instant case, given that: (1) La. R.S. 14:43.6 does not expressly provide that it is to be applied retroactively; (2) pursuant to La. R.S. 1:2 and La. C.C. art. 6, the statute clearly is substantive and thus cannot be applied retroactively; and (3) application of its provisions to defendant violates the ex post facto provisions of the Louisiana and federal constitutions, therefore, this part of defendant’s sentence is deleted.
ASSIGNMENT OF ERROR NO. 2
In his second assignment of error, the defendant argues that the evidence was insufficient to sustain his two convictions for aggravated rape.
When issues are raised on appeal as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. State v. Marcantel, 2000-1629, p. 8 (La.4/3/02), 815 So.2d 50, 55, citing State v. Hearold, 603 So.2d 731, 734 (La.1992).
This Court set forth the applicable standard of review for sufficiency of the evidence in State v. Huckabay, 2000-1082, p. 32 (La.App. 4 Cir. 2/6/02), 809 So.2d 1093, 1111, as follows:
In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Green, 588 So.2d 757 (La.App. 4 Cir.1991). However, the reviewing court may not disregard this duty simply because the record |1scontains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988). The reviewing court must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier’s view of all the evidence most favorable to the prosecution must be adopted. The fact finder’s discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mussall; Green; supra. “[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence.” State v. Smith, 600 So.2d 1319 (La.1992) at 1324.
In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate *770 test from Jackson v. Virginia, supra, but rather an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La. 1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So .2d 817 (La.1987).
Huclcabay, 2000-1082, p. 32, 809 So.2d at 1111, quoting State v. Ragas, 98-0011, pp. 13-14 (La.App. 4 Cir. 7/28/99), 744 So.2d 99,106-107.
The testimony of a single witness, if believed by the trier of fact, is sufficient to. support a conviction. State v. Wells, 2010-1338, p. 5 (La.App. 4 Cir. 3/30/11), 64 So.3d 303, 306. A factfinder’s decision concerning the credibility of a witness will not be disturbed unless it is clearly contrary to the evidence. State v. James, 2009-1188, p. 4 (La.App. 4 Cir. 2/24/10), 32 So.3d 993, 996.
The due process standard of review under Jackson v. Virginia does not sanction juror speculation if the evidence is such that a reasonable factfinder must have a reasonable doubt. State v. Higgins, 2003-1980, pp. 17-18 (La.4/1/05), 898 So.2d 1219, 1232, citing State v. Lubrano, 563 So.2d 847, 850 (La.1990).
| i9The defendant was convicted of two counts of aggravated rape, an offense defined in pertinent part by La. R.S. 14:42, as in effect in 1996 and 1997, as the act of anal or vaginal sexual intercourse with a male or female person committed without the person’s lawful consent, where such intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more the following circumstances:
(1) When the victim resists the act to the utmost but whose resistance is overcome by force.
(2) When the victim is prevented from resisting the act by threats of great and immediate bodily harm, accompanied by apparent power of execution.
(3) When the victim is prevented from resisting the act because the offender is armed with a dangerous weapon.
La. R.S. 14:2(3) defines “dangerous weapon” as including “any gas, liquid, or other substances or instrumentality, which, in the manner used, is calculated or likely to produce death of great bodily harm.”
The defendant does not contest the DNA evidence linking him to sexual activity with L.A., the victim of the 1996 rape, or D.B., the victim of the 1997 rape. Rather, he argues that the sex was consensual, a trade for drugs, and that no force, threats, or weapons were involved. The defendant essentially attacks the credibility of the victims. However, a reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence. Huclcabay, supra.
L.A. testified that her attacker wrapped a cord around her neck and dragged her to the location where he raped her, keeping the cord around her neck during the attack. She testified that her attacker told her that if she screamed he was going to kill her. Officer Guy recalled that a piece of nylon cord approximately forty-nine |2(1inches in length was collected as evidence in L.A.’s case, although he did not remember seeing any injuries to the victim’s neck consistent with having a cord or rope wrapped around it.
D.B. testified that she had left a bar and was walking to another corner bar when defendant came up behind her, slammed her up against a truck, and be *771 gan choking her such that she could hardly breathe. He then threw her down to the ground, breaking her arm (or dislocating her elbow), dragged her across a lot, and raped her.
Lieutenant Joseph Lorenzo testified that the crime scene in D.B.’s case was a vacant lot. He said D.B. sustained what was later determined to be a fractured arm. Her clothes were disheveled, and she had some mud and debris on them. She was a little intoxicated, was in pain, and had a contusion under her left eye.
Consistent with the 1996 and 1997 rapes of L.A. and D.B., respectively, N.H. testified that in 1993 she exited a bar and was confronted by the defendant, who placed a sharp object against her neck and vaginally raped her against her will. This occurred in the same general Central City neighborhood as the attacks on L.A. and D.B., who apparently had been in the same bar immediately prior to the respective rapes.
Viewing this and all the other evidence in a light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the offenses of aggravated rape of L.A. and D.B. present beyond a reasonable doubt.
There is no merit to this assignment of error.
la ASSIGNMENT OF ERROR NO. 1
In the defendant’s first assignment of error, he argues that the trial court erred in denying his motion for a new trial. The defendant timely filed a motion for new trial on January 26, 2011, arguing that the trial court erred in: (1) permitting the State to introduce evidence of his 1971 conviction for attempted aggravated rape and evidence pertaining to the alleged 1993 aggravated rape; and (2) limiting his cross examination of N.H., the alleged victim of the 1993 rape, and Detective DeJe-an, as to whether N.H. and/or her cousin, L.P., who was with her the.night of the alleged rape, were prostitutes.
Under La.C.Cr.P. art. 851, on motion of the defendant, a trial court shall grant a new trial, in pertinent part, whenever:
(2) The court’s ruling on a written motion, or an objection made during the proceedings, shows prejudicial error;
[[Image here]]
(5) The court is of the opinion that the ends of justice would be served by the granting of a new trial, although the defendant may not be entitled to a new trial as a matter of strict legal right.
A motion for new trial is based on the supposition that injustice has been done to the defendant; unless such injustice is shown to have been the case, the motion shall be denied, no matter upon what allegations it is grounded. La. C.Cr.P. art. 851. A trial court’s ruling on a motion for a new trial will not be disturbed on appeal absent a clear showing of an abuse of discretion. State v. Cox, 2010-2072, p. 1 (La.11/19/10), 48 So.3d 275, citing State v. Humphrey, 445 So.2d 1155, 1160 (La.1984).

Other Crimes Evidence

|22On October 15, 2010, the State filed a notice of intent to offer evidence, pursuant to La. C.E. art. 404(B), that the defendant: (1) committed the aggravated rape of N.H. on September 7, 1993, at 2421 Danneel Street, by forcing her into a stairwell, holding an unknown object to her throat, and forcing her to engage in penile/vaginal intercourse; and (2) that he pleaded guilty to attempted aggravated rape in 1971 in connection with a robbery and rape committed on July 2, 1971, at 3200 LaSalle Street.
The Louisiana Supreme Court set forth the applicable law in State v. Rose, 2006- *772 0402, pp. 12-13 (La.2/22/07), 949 So.2d 1236,1243-1244, as follows:
It is well settled that courts may not admit evidence of other crimes to show the defendant as a man of bad character who has acted in conformity with his bad character. La. C.E. art. 404(B)(1); State v. Williams, 96-1023, p. 30 (La.1/21/98), 708 So.2d 703, 725; State v. Prieur, 277 So.2d 126, 128 (La.1973). Evidence of other crimes, wrongs or acts committed by the defendant is generally inadmissible because of the “substantial risk of grave prejudice to the defendant.” Prieur, 277 So.2d at 128. However, the State may introduce evidence of other crimes, wrongs or acts if it establishes an independent and relevant reason such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. La. C.E. art. 404(B)(1). The State must provide the defendant with notice and a hearing before trial if it intends to offer such evidence. Prieur, 277 So.2d at 130. Even when the other crimes evidence is offered for a purpose allowed under art. 404(B)(1), the evidence is not admissible unless it tends to prove a material fact at issue or to rebut a defendant’s defense. State v. Martin, 377 So.2d 259, 263 (La.1979); Prieur, 277 So.2d at 130. The State also bears the burden of proving that defendant committed the other crimes, wrongs or acts. State v. Galliano, 2002-2849, p. 2 (La.1/10/03), 839 So.2d 932, 933 (per curiam).
Although a defendant’s prior bad acts may be relevant and otherwise admissible under La. C.E. art. 404(B), the court must still balance the probative value of the evidence against its prejudicial effects before the evidence can be admitted. La. C.E. art. 403. Any inculpatory evidence is “prejudicial” to a defendant, especially when it is “probative” to a high degree. State v. Germain, 433 So.2d 110, 118 (La.1983). As used in the balancing test, “prejudicial” limits the introduction of probative evidence of pri- or misconduct only when it is unduly and unfairly prejudicial. Id. See also Old Chief v. United States, 519 U.S. 172, 180, 117 S.Ct. 644, 650, 136 L.Ed.2d 574 (1997)(“The term ‘unfair prejudice,’ as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged.”). (Footnote omitted).
A trial court’s ruling on the admissibility under La. C.E. art. 404(B)(1) of other crimes evidence is reviewable under an abuse of discretion standard. See State v. Henderson, 2012-2422, pp. 3-4 (La.1/4/13), 107 So.3d 566, 568 (“[W]e we conclude the trial court abused its discretion in finding the defendant’s prior conviction to be inadmissible under LSAC.E. art. 404(B)(1)”); State v. Barnes, 2011-1421, p. 15 (La.App. 4 Cir. 9/19/12), 100 So.3d 926, 936, writ denied, 2012-2251 (La.4/1/13), 110 So.3d 575; State v. Gibson, 99-2827, p. 12 (La.App. 4 Cir. 4/11/01), 785 So.2d 213, 220. A trial court’s ruling as to the relevancy of evidence will not be disturbed absent a clear abuse of discretion. State v. Sanders, 2012-0409, p. 14 (La.App. 4 Cir. 11/14/12), 104 So.3d 619, 630. A trial court is vested with much discretion in determining whether the probative value of relevant evidence is substantially outweighed by its prejudicial effect. State v. Girard, 2012-0790, p. 6 (La.App. 4 Cir. 3/6/13), 110 So.3d 687, 691, writ denied, (La.9/20/13), 123 So.3d 170.
The defendant filed a memorandum in opposition to the State’s notice of intent to introduce the evidence of the other crimes committed by the defendant. The record contains a judgment signed by the trial *773 court, dated December 10, 2010, in which the trial court granted the State’s request to admit the evidence. The trial court cited La. C.E. art. 412.2 as the basis for admitting the evidence.
La. C.E. art. 412.2 states:
A. When an accused is charged with a crime involving sexually as-saultive behavior, or with acts that constitute a sex offense involving a victim who was under the age of seventeen at the time of the offense, ^evidence of the accused’s commission of another crime, wrong, or act involving sexually assaultive behavior or acts which indicate a lustful disposition toward children may be admissible and may be considered for its bearing on any matter to which it is relevant subject to the balancing test provided in Article 403.
B. In a case in which the state intends to offer evidence under the provisions of this Article, the prosecution shall, upon request of the accused, provide reasonable notice in advance of trial of the nature of any such evidence it intends to introduce at trial for such purposes.
This Article shall not be construed to limit the admission or consideration of evidence under any other rule. (Emphasis added).
La. C.E. art. 403 states: “Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time.”
The trial court in the instant case expressly found that the evidence at issue was highly probative and was not outweighed by the danger of unfair prejudice, confusion of the issues, or delay. This same balancing process is applicable to the admission of all evidence, under La. C.E. art. 403, including evidence of other crimes committed by the defendant that is sought to be admitted pursuant to La. C.E. art. 404(B)(1).
“Unfair prejudice,” as used in La. C.E. art. 403, means that “the offered evidence has ‘an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.’ ” Author’s Note (3), La. C.E. art. 403, Handbook on Louisiana Evidence Law, Pugh, Force, Rault & Triche, p. 380 (2011). A trial court is vested with much discretion in determining whether the probative value of relevant evidence is substantially outweighed by its prejudicial effect. State v. Henry, 2011-1137, p. 9 (La.App. 4 Cir. 10/24/12), 102 So.3d 1016, 1022, writ denied, 2012-2520 (La.4/26/13), 112 So.3d 838; State v. White, 2009-0025, p. 9 (La.App. 4 Cir. 9/16/09), 22 So.3d 197, 204.
The defendant was being tried for two counts of aggravated rape, one from 1996 and one from 1997, that were both committed in the same Central City area, the same area where the defendant was arrested on February 10, 2010, for the 1996 and 1997 rapes. The alleged 1993 aggravated rape of N.H., evidence of which the State sought to introduce, was committed near Second and Danneel Streets, which was in that same neighborhood. Even more importantly, D.B., the victim in the 1997 rape for which the defendant was being tried, testified that she had gone to a bar at the corner of Second and Danneel Streets called “Big Time Crypts” and that she was raped as she walked from there to another corner bar. The victim in the 1993 other crimes case, N.H., testified that she had been in a club called “Crypts,” and had gone outside with her cousin to sit on some nearby steps when the defendant allegedly accosted her, *774 holding something sharp against her neck and raping her. These two bars/clubs, “Big Time Crypts” and “Crypts,” are undoubtedly the same. There is a remarkable similarity between the two crimes, which occurred some four years apart.
L.A., the victim in the 1996 rape for which the defendant was being tried, testified that she was raped in the 1800 block of Louisiana Avenue, between Dryades and Baronne Streets. Danneel Street, where the “Crypts” bar/club that factored into the 1997 and 1993 rapes was located, is the next street over from Dryades Street. The defendant was also arrested in February 2010, in the 1800 block of Louisiana Avenue for the 1997 and 1996 rapes on an outstanding arrest warrant obtained after he was linked to those crimes by DNA evidence.
| grin the 1996 and 1997 rapes for which the defendant was being tried, and in the 1993 unadjudicated rape, the defendant used force against, or threatened to use force against, the necks of each victim at some point during each of the respective attacks.
The evidence was admissible as evidence of another crime, wrong, or act to show preparation and plan under La. C.E. art. 404(B)(1), as well as under La. C.E. art. 412.2(A) as evidence of the defendant’s commission of another prior crime, wrong, or act involving sexually assaultive behavior. Further, it cannot be said that the trial court abused its discretion in concluding that the probative value of evidence concerning the unadjudicated 1993 aggravated rape was substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time.
As for the admissibility of evidence concerning the 1971 attempted aggravated rape to which the defendant pleaded guilty, it is first to be noted that the defendant ultimately testified in his own behalf. Thus, evidence of this prior conviction was admissible under La. C.E. art. 609.1, as it would have been admissible as to any witness testifying in a criminal case — although generally only the fact of the conviction is admissible. However, the trial court granted the State’s motion/notice to introduce evidence of the 1971 attempted aggravated rape in December 2010, prior to the early January 2011 trial. Thus, the defendant’s decision to waive his Fifth Amendment right to remain silent and to testify at his trial might have been influenced by the trial court’s pretrial ruling, which the defendant now attacks as erroneous.
The facts established by documents in the record are that in July 1971, the defendant, then age sixteen, and two others were indicted for aggravated rape. One 127defendant pleaded guilty as charged to avoid the death penalty. The defendant and the third individual pleaded guilty to attempted aggravated rape and were each sentenced to twenty years at hard labor. The defendant admitted this conviction when he testified at trial, stating that he had acted as a lookout for the two others in a robbery during which the rape occurred. He denied any involvement in the rape.
The defendant argues that the facts of this 1971 crime are not similar to the facts of the 1996 or 1997 aggravated rapes for which he was being tried. However, the 1971 conviction was for an attempted aggravated rape that occurred in the 3200 block of LaSalle Street, the same general vicinity in which the 1996 and 1997 crimes were committed. The trial court admitted all the prior crimes evidence pursuant to La. C.E. art. 412.2, as evidence of defendant’s commission of another prior crime, wrong, or act involving sexually assaultive *775 behavior. The 1971 conviction fits under that category.
Nevertheless, admissibility under La. C.E. art. 412.2 is expressly subject to the balancing test of La. C.E. art. 403. In addition to the lack of factual similarity between the 1971 and the 1996 and 1997 crimes, the 1971 crime occurred approximately twenty-five years prior to those later crimes. Remoteness in time is generally only one factor to be considered when determining whether the probative value of other acts evidence outweighs its prejudicial effect. Henry, 2011-1137, p. 11, 102 So.3d at 1023; State v. Scoggins, 2010-0869, pp. 13-14 (La.App. 4 Cir. 6/17/11), 70 So.3d 145, 154.
Even assuming that the trial court abused its discretion in finding that the probative value of the evidence of defendant’s 1971 conviction for aggravated rape, and the facts concerning it, was not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or delay, the erroneous admission of other | ^crimes evidence is subject to the harmless error rule. Henry, 2011-1137, p. 13, 102 So.3d at 1024; Scoggins, 2010-0869, p. 15, 70 So.3d at 154. Harmless error exists where the guilty verdict actually rendered was “surely unattributable” to the error. State v. Higginbotham, 2011-0564, p. 3 (La.5/6/11), 60 So.3d 621, 623; Scoggins, supra.
The jury was well aware of the dissimilarities and remoteness in time between the 1971 crime and the 1996 and 1997 crimes. Considering all the facts and circumstances of the instant case, the guilty verdicts rendered in the instant cases were unattributable to any error by the trial court in its pretrial ruling admitting evidence of defendant’s 1971 conviction for attempted aggravated rape. Therefore, the trial court did not abuse its discretion in denying defendant’s motion for new trial based on this alleged error.
There is no merit to this part of the instant assignment of error.

Limitation of Cross Examination

The defendant next argues that the trial court erred in denying his motion for new trial insofar as it was based on the court’s limitation of defense counsel’s questioning of N.H. and Detective DeJean regarding whether N.H. or her cousin, L.P., were prostitutes. In his motion for new trial, the defendant did not mention the name of the witness, but does refer to the unadjudicated 1993 rape, which involved N.H., and refers to the “witness and/or her cousin.”
During defense counsel’s cross examination of Detective DeJean, he asked whether, in the course of his investigation of the 1993 rape, the detective had asked the victim, N.H., whether or not she was a prostitute.
Q. In your investigation, did you ask the victim whether or not she was a prostitute?
hsA- Yes, I did.
Q. Did you have concerns about her being a prostitute?
Ms. Parker:
Objection, Your Honor as to relevance and, really, this violates the rape shield laws.
MR. COX:
Judge, I’m not offering this as evidence, I’m cross examining this former detective about the comments he made in his report. They are right here (indicating).
THE COURT:
They may be comments made in his report, but I don’t find them relevant nor do — I think they are—
MR. COX:
*776 Note my objection for the record.
THE COURT:
—outside the bounds of the rape shield law.
MR. COX:
Well, I think rape shield requires me to offer evidence. This is the State’s own evidence, not mine.
THE COURT:
Right.
MR. COX:
So is the State’s objection granted?
THE COURT: Yes.
CROSS EXAMINATION
BY MR. COX:
Q. Did you ask her cousin if her cousin was a prostitute?
MS. PARKER:
Again, Your Honor, relevance and—
MR. COX:
The cousin is not the victim, Judge. Rape shield doesn’t apply to her.
UnTHE COURT:
Since she is not the victim it is not relevant.
MR. COX:
She was there.
The Sixth Amendment to the U.S. Constitution guarantees the right of an accused in a criminal prosecution “to be confronted with the witnesses against him.” The main and essential purpose of confrontation is to secure the opportunity of cross examination. Davis v. Alaska, 415 U.S. 308, 315-16, 94 S.Ct. 1105, 1110 39 L.Ed.2d 347 (1974). In addition, La. Const. Art. I, § 16 states, in pertinent part, that “[a]n accused is entitled to confront and cross-examine the witnesses against him.” La. C.E. art. 611(B) provides that a witness in a criminal case may be cross examined on any matter relevant to any issue in the ease.
The defendant’s defense was that he did not remember any of the three victims who testified, L.A., D.B., or N.H., but that if he had had sexual relations with them, it had been consensual. He testified that he had never raped anyone, but that he used to exchange crack cocaine for sex with women and/or have sex with women during crack cocaine parties. The defendant never said he frequented prostitutes or that he engaged in sexual relations with prostitutes in exchange for crack cocaine. It can also be noted that in his closing argument defense counsel did not refer to the term “prostitute,” although he emphasized the defendant’s testimony that he traded crack cocaine for sex.
The trial court first ruled that evidence as to N.H. being a prostitute was irrelevant.
All relevant evidence is admissible, and evidence that is not relevant is not admissible. La. C.E. art. 402. La. C.E. art. 401 defines relevant evidence as “evidence having any tendency to make the existence of any fact that is of |S1 consequence to the determination of the action more probable or less probable than it would be without the evidence.” A trial court’s ruling as to the relevancy of evidence will not be disturbed absent a clear abuse of discretion. Girard, supra; State v. Sanders, 2012-0409, p. 14 (La.App. 4 Cir. 11/14/12), 104 So.3d 619, 630.
The State objected to the question defense counsel asked of Detective DeJean as to whether he had concerns about N.H. being a prostitute. The trial court sustained the State’s objection to that question. It is to be noted that Detective DeJean’s supplemental police report was introduced for record purposes only and is contained in the record. In that supplemental report the detective recorded that *777 N.H. had denied being a prostitute. The defense counsel had this supplemental report. However, defense counsel sought to elicit from the former detective whether he had concerns about N.H. being a prostitute. Under these circumstances, it cannot be said that the trial court clearly-abused its discretion in ruling that the particular question to which the State objected was irrelevant.
The defendant’s primary argument in this particular part of the instant assignment of error is that the trial court erred in ruling that the question asked of Detective DeJean would have contravened the rape shield law, La. R.S. 412, which generally prohibits the introduction of reputation or opinion evidence of the past sexual behavior of the “victim” “[w]hen an accused is charged with a crime involving sexually assaultive behavior.” The defendant argues that he was not “charged [meaning indicted] with a crime involving sexually assaultive behavior” as to N.H., and that thus she was not a “victim,” as contemplated by La. C.E. art. 412.
However, resolution of the rape shield issue is not necessary, given that the trial court sustained the State’s objection on the grounds of both relevancy and as | .^prohibited by La. C.E. art. 412. The objection was properly sustained as to N.H. on relevancy grounds, as was a subsequent objection on relevancy grounds as to a question from defense counsel as to whether of Detective DeJean had asked N.H.’s cousin, L.P., who was not a victim of a sexual assault that night, if she was a prostitute. Therefore, the trial court did not abuse its discretion in denying the defendant’s motion for new trial based on this alleged error.
There is no merit to this assignment of error.
CONCLUSION
For the foregoing reasons, the defendant’s convictions are affirmed; his sentence as to Count 1 is affirmed; his sentence as a second-felony habitual offender as to Count 4 is amended to delete the restriction that it be served without the benefit of parole; the additional sentence that defendant be treated with medroxy-progesterone acetate (“chemically castrated”) for the rest of his life as per La. R.S. 14:43.6 is deleted; and the case is remanded for sentencing as to the aggravated rape conviction in Count 3.
CONVICTIONS AFFIRMED; SENTENCES AFFIRMED IN PART, AMENDED IN PART AND REMANDED

. State v. Prieur, 277 So.2d 126 (La.1973).

. Reliagene Technologies is a private DNA laboratory that performs DNA testing primarily for law enforcement agencies and district attorney officers.