833 So.2d 497 (2002)
STATE of Louisiana
v.
Mervyn WILLIAMS.
No. 02-KA-645.
Court of Appeal of Louisiana, Fifth Circuit.
November 26, 2002.
*498 Paul D. Connick, District Attorney, State of Louisiana, Terry M. Boudreaux, Alan D. Alario, II, Assistant District Attorneys, *499 Gretna, LA, for State of Louisiana, Plaintiff/Appellee.
Cary J. Deaton, New Orleans, LA, for Mervyn Williams, Defendant/Appellant.
Panel composed of Judges SOL GOTHARD, SUSAN M. CHEHARDY and WALTER J. ROTHSCHILD.
WALTER J. ROTHSCHILD, Judge.
Defendant, Mervyn Williams, along with co-defendants, Steven Bailey and Anthony Gusman, were indicted by a grand jury on January 4, 1996 with two counts of first degree murder in violation of LSA-R.S. 14:30. Defendant pled not guilty and filed several pre-trial motions including a motion to suppress identification. After a hearing, his motion to suppress identification was denied. Defendant proceeded to trial along with his two co-defendants on August 10, 1998. Trial lasted approximately three and one-half weeks, two of which consisted solely of jury selection. After deliberating for approximately five hours, the jury was unable to agree on a verdict.
Thereafter, a motion to sever the parties was granted. Defendant filed additional pre-trial motions including a motion in limine regarding evidence of gangs and reurged his prior motion to suppress identification. A ruling on the motion in limine was deferred to trial and the trial court again denied defendant's motion to suppress identification. On October 25, 1999, the State amended the indictment reducing the charges against defendant to two counts of second degree murder in violation of LSA-R.S. 14:30.1.[1] On the same day, defendant waived his right to a jury and proceeded to a bench trial. After four days of testimony, the trial judge found defendant guilty as charged on both counts. He was sentenced to life imprisonment on each count to run concurrently without the benefit of parole, probation or suspension of sentence.

FACTS
Shortly after midnight on November 23, 1995, victims, Ramona Osborn and Theodore McCullum, were fatally shot while driving through the Harvey Tunnel. Osborn was driving a red Mitsubishi with passengers Theodore McCullum, Brian Payne[2], Peter Rodrigue, Kevin Dorsey and Sahara Gilmore, according to testimony of Peter Rodrigue.[3] The group had left a party and were heading home on the elevated portion of the Westbank Expressway when Rodrigue noticed two cars, a little blue car and a black Grand Prix which he recognized as belonging to "Scaboo" Bailey (a/k/a Steven Bailey). Rodrigue was concerned and instructed Osborn to slow down and let the cars pass. Osborn exited the expressway and entered the Harvey tunnel. Once in the tunnel, they heard shots coming from behind. Rodrigue told Osborn to stop but she was nonresponsive. He grabbed the steering wheel and guided the car. The offending vehicle, the little blue car, pulled along *500 side Osborn's car at which time Rodrigue looked over at it and saw a rifle and a handgun. He further saw that the driver resembled "Whiteboy" (a/k/a Anthony Gusman) and the front seat passenger resembled defendant. The shooting ended when Osborn's car came to a stop outside the tunnel.
On the night of the shooting, Deputy Aaron Wilkie was working a detail at a car dealership approximately one-half mile away from the Harvey Tunnel when he heard shots. He got into his unit and drove around trying to locate the source of the shots. Within minutes, Deputy Wilkie came upon the crime scene on the eastbound up-slope of the Harvey Tunnel. He found the driver, Osborn, conscious but incoherent. He found the front seat passenger, later identified as Peter Rodrigue, seated upright, dazed and unable to communicate. He observed one back seat passenger, later identified as Kevin Dorsey, sitting behind the driver with his eyes wide open in apparent shock and another back seat passenger, later identified as Brian Payne, lying on his stomach across the transmission hump. He also saw McCullum lying half in the car and half out of the car with a gunshot wound to his head.
Osborn was shot ten times. She suffered a lethal wound to her spleen and lung and one potentially lethal wound to her stomach. She was taken to the hospital where she later died. McCullum suffered a graze wound to his skull, where the bullet went through his upper scalp and caused a fracture of the skull resulting in a lethal injury to his brain. He died at the scene. The other passengers were also injured. Kevin Dorsey was shot in the foot and Peter Rodrigue was shot in the hand, chest, back, hip and left thigh.
Detective Steve Buras and Sergeant Gray Thurman processed and investigated the crime scene. Numerous casings and fragment projectiles were found throughout the eastbound lane of the Harvey tunnel. The casings and fragment projectiles were identified as coming from the same.32 caliber weapon and AK47. The red Mitsubishi had several bullet holes on the driver's side of the car and in the rear of the car near the license plate and the windows were shot out.
During the course of his investigation, Sergeant Thurman interviewed passenger Peter Rodrigue, who was in ICU at Charity Hospital for the injuries he sustained in the shooting. Rodrigue described the person involved in the shooting. Sergeant Thurman then compiled two photographic lineups and showed them to Rodrigue. Rodrigue identified defendant as being involved in the shooting. In a subsequent interview on December 8, 1995, Rodrigue identified defendant by name. An arrest warrant was obtained for defendant and a search warrant was obtained for his residence, 4143 Lac Bienville, Apt. C.
Surveillance was conducted of 4143 Lac Bienville prior to the execution of the search warrant. A car leaving the premises was stopped and defendant was found to be inside. He was arrested pursuant to the warrant for his arrest and taken to the detective bureau. Thereafter, the police executed the search warrant. Among items found and seized during the execution of the search warrant were a bag with 12 blue and black bandanas, various weapons and ammunition, three original lyrics of a song/poem written in pencil on loose leaf paper and a photo album with pictures and a torn caption from the newspaper, "No suspects in shooting."
Both passengers and shooting victims, Kevin Dorsey and Peter Rodrigue, testified that they were members of the Bloods gang, who wear the color red. Rodrigue testified that passenger Brian Payne was a *501 Blood gang member, passenger Sahara Gilmore lived in a Blood neighborhood and victim Ramona Osborn was affiliated with the Bloods. Rodrigue stated that in November 1995 there was a territory problem between the Bloods and the Crips gang. He stated that the Crips, who wear the color blue, would come through the Bloods' territory "throwing up" their gang signs. He specifically testified that defendant and Anthony Gusman came through throwing up signs on the morning of the shooting. Detective Maurice Wilson, an expert in the field of gangs, their colors, signs and language, explained gang signs and the ways to disrespect a gang's sign. He testified that the photographs in the photo album, S-36, depicted Crip gang members flashing their signs and disrespecting Blood signs. Dorsey testified that defendant was pictured in that photo album throwing a "Blood killer" sign. Sgt. Thurman testified that he classified the shooting as a "gang shooting."
At trial, defendant presented an alibi witness, Capricia Lucas. Lucas, defendant's girlfriend, testified that defendant was home with her at the time of the shooting. Defendant also presented the testimony of Sorrell Duncan, an admitted Crip gang member, who testified that defendant was not in a gang and disputed the fact that defendant was throwing a Crip or Blood killer sign in the photograph admitted into evidence. Duncan also testified that the rap song labeled as S-33, containing the reference to the tunnel, was written by rap artist "G-Slim" (a/k/a Kenneth Jackson), who has since died from a gunshot wound. Duncan stated that defendant was not "rapping" with them when the song was written. Kevin Dorsey, who was called to testify by the defense, testified that Kenneth Jackson was the driver of the offending car and Anthony Gusman was the passenger and shooter. Dorsey denied ever seeing defendant in the tunnel on the night of the shooting.

DISCUSSION
In assignments of error numbers one, three and four, defendant contends that the statements of Peter Rodrigue were insufficient to support his conviction. By these assignments of error, defendant argues there was insufficient evidence to convict him of second degree murder because there was unreliable identification evidence. Peter Rodrigue was the only witness who identified defendant as being involved in the shooting. Defendant claims Rodrigue's identification is untrustworthy because 1) the shooting occurred late at night, 2) Rodrigue was on drugs and alcohol which affected his perception at the time of the shooting, 3) Rodrigue had only a split-second view of the perpetrator, and 4) Rodrigue was trying to drive the vehicle after the driver had been shot. Defendant contends these factors render the identification of him as the perpetrator of the crime highly unreliable and, therefore, insufficient to prove the element of identity beyond a reasonable doubt.
Defendant further contends other witnesses negate Rodrigue's identification. In particular, defendant points out that Kevin Dorsey, who was riding behind the victim, Osborn, testified that he did not see defendant in the offending car. Additionally, Capricia Lucas testified defendant was at home with her on the night of the shooting.
The standard of review for the sufficiency of evidence to uphold a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could conclude that the State proved the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In addition to proving the statutory elements *502 of the charged offense at trial, the State is required to prove the identity of the perpetrator. State v. Vasquez, 98-898 (La.App. 5 Cir. 2/10/99), 729 So.2d 65, 69. Where the key issue is identification, the State is required to negate any reasonable probability of misidentification in order to carry its burden of proof.[4]Id.
Under Jackson, a review of a criminal conviction record for sufficiency of evidence does not require a court to ask itself whether it believes that the evidence at trial established guilty beyond a reasonable doubt. A reviewing court is required to consider the whole record, and determine whether a rational trier of fact would have found guilt beyond a reasonable doubt. The actual trier of fact is presumed to have acted rationally until it appears otherwise. State v. Mussall, 523 So.2d 1305, 1310 (La.1988).
Peter Rodrigue was the only witness to identify defendant as being involved in the shooting. He was a front seat passenger in Osborn's car. He testified that when he looked over at the offending car he could see in the front seat but could not see who was in the back seat. He stated he saw "[a] shape that resembled one of the defendants over there and his partner in crime, Mervyn. I seen a heavy-set guy on the passenger side with a lightweight afro with a hat over his head, you know, kind of heavy build and the driver with the pony tail that resemble White Boy."
Rodrigue admitted that he had used a marijuana joint dipped in PCP earlier on the day of the shooting but denied that it had any affect on his vision or perception. Dr. William George, an expert in pharmacology and toxicology, testified that marijuana and PCP can affect a person's reliability and accuracy in reporting events. He explained marijuana decreases sensory perception and PCP creates sensory dissociation. He further testified that the drugs' acute effects usually last four to six hours depending on dosage. A high dose can have lingering effects for up to 24 hours.
Rodrigue also testified that he gave Sgt. Thurman "Scaboo's" name when Sgt. Thurman first visited him at Charity. It was not until Sgt. Thurman's next visit that Rodrigue gave him the names of defendant and "Whiteboy." Rodrigue explained that he did not want to give Sgt. Thurman all the names because he initially wanted to handle the situation himself without involving the court. He stated that he turned over the names when he almost died from his injuries.
Sgt. Thurman testified that Rodrigue did not identify defendant during their first interview on November 27, 1995. However, the next day, Sgt. Thurman showed Rodrigue two photographic line-ups from one of which Rodrigue identified defendant. Additionally, during his trial testimony, Rodrigue positively identified defendant as a perpetrator of the shooting.
Defendant argues Rodrigue's identification was unreliable because he was on drugs at the time of the shooting and because other witnesses stated they did not see defendant at the scene of the shooting. It is the fact finder's function to determine the weight of the evidence bearing on the defendant's identification. It is not the appellate court's function to reevaluate the credibility choices made by the fact finder. State v. Spencer, 93-571 (La. App. 5 Cir. 1/25/94), 631 So.2d 1363, 1370, *503 writ denied, 94-488 (La.2/3/95), 649 So.2d 400.
The trial court heard the evidence of Dr. George regarding the effects drugs can have on a person's perception. Dr. George was only able to testify in generalities. He noted Rodrigue's medical records from Charity indicated an overdose of PCP. However, he stated Rodrigue's medical records did not indicate he was suffering from nystagmus, or rapid eye movement, indicative of drug use. Dr. George testified about the possibilities of the drugs' effects and stated the effects were dose dependent. He did not know the amount of drugs taken by Rodrigue or even when Rodrigue had taken the drugs. Dr. George explained the acute effects of the drugs last between four to six hours and decrease significantly over time. Rodrigue testified that he last used PCP on the morning of the shooting which occurred shortly after midnight.
Additionally, the trial court heard the testimony of Capricia Lucas, who testified defendant was home with her at the time of the shooting, and Kevin Dorsey, a back seat passenger of Osborn's car who testified he did not see defendant in the tunnel on the night of the shooting. Lucas testified that defendant was her boyfriend and the father of her two children. It is not unreasonable to conclude that Lucas had an interest in protecting defendant.
Dorsey testified for the State during the first trial but testified for the defense in the second trial. At the second trial, for the first time, Dorsey identified the driver of the offending car as "G-Slim", Kenneth Jackson. He maintained Anthony Gusman was the passenger of the offending car and that he did not see defendant in the tunnel on the night of the shooting. Dorsey admitted he has lied a lot throughout this case and that someone told him who the driver was of the offending car. He stated he could not be sure the driver was Jackson. Dorsey further admitted that he could not say whether defendant was or was not in the offending car.
The trial court heard all of the evidence and apparently chose to believe Rodrigue's testimony identifying defendant as either the perpetrator of or a principal to second degree murder. Rodrigue positively identified defendant as one of the perpetrators of the crime in a photographic line-up and again in court. Positive identification by only one witness is sufficient to support a conviction. State v. Cowart, 01-1178 (La.App. 5 Cir. 3/26/02), 815 So.2d 275, 283, citing State v. Mussall, supra at 1311.[5] Viewing the evidence in a light most favorable to the prosecution, we find that the State sufficiently *504 negated any reasonable probability of misidentification and a rational trier of fact could find, beyond a reasonable doubt, that defendant was the perpetrator of or a principal to the crime of second degree murder.
In assignment of error number two, defendant essentially argues that the trial court committed reversible error in allowing Peter Rodrigue's testimony from the first trial to be used in the second trial. He contends the State did not make a diligent effort to locate Rodrigue and, thus, he did not qualify as an unavailable witness. Defendant maintains this prevented him from cross-examining Rodrigue in the second trial regarding his identification of him as being involved in the shooting, which was crucial to defendant's defense.
Prior to trial on August 16, 1999, the State made a motion to use the prior testimony of Rodrigue at trial under the authority of LSA-C.E. art. 804B(1). The trial court initially denied the motion but granted the State a continuance to give it more time to locate Rodrigue. When trial commenced on October 25, 1999, the State again made a motion to use the prior testimony of Rodrigue and a hearing was held. This time the trial court granted the State's motion and ruled that the transcript and tape of Rodrigue's prior testimony could be used at trial.
LSA-C.E. art. 804B(1) permits the introduction of former testimony of an unavailable witness taken at another hearing if the party against whom the testimony is offered had the opportunity to develop the testimony by direct, cross, or redirect examination. An unavailable witness is defined as a declarant who "cannot or will not appear in court and testify to the substance of his statement made outside of court" including situations where the declarant "is absent from the hearing and the proponent of his statement has been unable to procure his attendance by process or other reasonable means." LSA-C.E. art. 804A(5).
In State v. Robinson, 423 So.2d 1053, 1058 (La.1982), the supreme court explained that when testimony taken at a prior proceeding is to be used at trial, there must be an examination into whether there has been a violation of the defendant's right to confrontation under the Sixth Amendment of the United States Constitution and Article I, Section 16 of the Louisiana Constitution. In order to avoid offending the confrontation and cross-examination clauses of the federal and state constitutions when using prior testimony at a subsequent trial, the following conditions must be met: 1) defendant must have been represented by counsel at the earlier hearing; 2) the witness testified under oath; 3) the witness was cross-examined or else there was a valid waiver of the right to cross-examination; 4) at the time of the trial, the witness is unavailable or unable to testify; and 5) the State has made a good faith diligent effort to obtain the presence of the witness, including by its out-of-state subpoena powers where appropriate. State v. Robinson, supra, citing State v. Hills, 379 So.2d 740, 743-744 (La.1980).
The first three conditions have been met: 1) defendant was represented by counsel during the first trial, 2) Rodrigue testified under oath during the first trial, and 3) Rodrigue was cross-examined by three different attorneys.[6] The inquiry is whether Rodrigue was truly unavailable for trial and whether the State made a *505 good faith diligent effort to obtain his presence.
At the August 16, 1999 hearing on the motion to use prior testimony, the State presented the testimony of Sergeant Gray Thurman. Sgt. Thurman testified that he had made several unsuccessful attempts to locate Rodrigue since his last personal contact with him in September 1998, the date of the first trial. He explained that he obtained several contact numbers from Rodrigue in the event he left town. Rodrigue gave Sgt. Thurman the phone number of an aunt in Seattle and the street address of a second aunt in Seattle. Sgt. Thurman called the aunt in Seattle three times but received no return calls. He went to Rodrigue's mother's last known address in Harvey but found the house vacant with no electrical meter. He checked Rodrigue's mother's driver's license for a new address to no avail. He paged Rodrigue's mother though a beeper number he had but was unsuccessful. Sgt. Thurman then contacted Rodrigue's grandmother who advised Rodrigue's mother had moved out of town. He also attempted to locate Rodrigue's half-sister at Charity Hospital, where she used to work, but discovered she no longer worked there.
Sgt. Thurman further testified he contacted the Seattle Police Department and requested help in serving a subpoena on Rodrigue at two different addresses. He was advised by the Seattle Police Department that Rodrigue had a felony arrest warrant in Seattle. Sgt. Thurman learned of several addresses in Monroe where Rodrigue could possibly be. He gave the Monroe Police Department four different addresses and asked them to serve the subpoena on Rodrigue. However, Sgt. Thurman was told Rodrigue did not live at any of the addresses. All of the above efforts took place between July 22, 1999 and August 13, 1999.
At the hearing on the State's motion to use Rodrigue's prior testimony on the day of trial, Sgt. Thurman testified that since the last hearing, he and Donnie Rowan, the assistant district attorney, traveled to Seattle to locate Rodrigue. He stated they met with the Seattle Police Department who assisted in the search. The Seattle Police Department distributed a "wanted" flyer to officers who patrol the area where Rodrigue was believed to be. They went to Rodrigue's mother's address three times and conducted surveillance on the apartment for one hour. They located Rodrigue's mother, aunt and girlfriend but were unable to locate Rodrigue. Additionally, a material witness warrant was issued for Rodrigue.
The lengths to which the State must go to try to produce a witness is a question of reasonableness. State v. Robinson, 423 So.2d at 1059. In State v. Fuller, 32,734 (La.App. 2 Cir. 12/17/99), 759 So.2d 104, 108, writ denied, 00-159 (La.8/31/00), 766 So.2d 1273, the Second Circuit found the State's efforts to locate a witness sufficient to satisfy a good faith diligent effort. In Fuller, the investigator for the district attorney's office testified that he contacted the witness' family in excess of five times in an attempt to serve a subpoena on the witness. He was told the witness rarely visited the family home. On one occasion, the witness' mother told the investigator she had relayed the information to the witness; however, the witness never contacted the investigator. The investigator then obtained information that the witness lived out of town. He tried to locate the witness at the out-of-town address through that town's local sheriff's office but they were unable to locate the witness. The investigator opined that the witness was attempting to dodge service of the subpoena.
*506 Defendant cites State v. Kaufman, 304 So.2d 300 (La.1974), to support his position that the State failed to make a diligent effort to secure Rodrigue's appearance for trial. In Kaufman, the Supreme Court found the State's efforts to locate four witnesses on the eve of and during trial to be perfunctory. The Supreme Court concluded the State's efforts fell short of the diligent and good faith efforts required to locate a witness before he can be found to be unavailable so as to permit his testimony by paper instead of in person. The investigator in Kaufman did little more than try to locate the witnesses at their last known addresses and through utility and telephone records. The investigator learned that one witness had moved to Houston but did not follow up with that information. The Supreme Court criticized the investigator's failure to exhaust all his avenues of information such as checking with a witness' former employer in one instance and locating one witness' husband in another instance.
The record in the present case demonstrates that Rodrigue was avoiding service of the subpoena. Sgt. Thurman testified he had a few problems with Rodrigue not wanting to testify during the first trial. Additionally, Rodrigue was dodging a felony arrest warrant in Seattle. The State's efforts to locate Rodrigue clearly exceed those efforts made in Kaufman as well as Fuller. Furthermore, it is noted that Rodrigue was fully cross-examined on the issue of identification during the first trial. Therefore, we find no error of the trial court in finding the State made a diligent good faith effort to locate Rodrigue and concluding Rodrigue was an unavailable witness so as to allow his prior trial testimony to be used during the second trial.
By his final assignment of error, defendant argues that the trial court erred in failing to exclude so much testimony about gang activity and culture. He alleges testimony about gang activity is a violation of LSA-C.E. 404B, which prohibits the use of evidence of other crimes or bad acts to show bad character of the defendant in order to show he acted in conformity therewith. Defendant specifically claims the references to defendant's use of gang hand signals in certain pictures was irrelevant to the specific act of the shooting.
Prior to trial, defendant filed a motion in limine to prevent evidence of gang activity as impermissible evidence of other crimes or bad acts. In a hearing on March 26, 1999, the trial court denied the motion in part.[7] At a later hearing on August 16, 1999, defendant re-urged his motion in limine. The trial court deferred its ruling to the trial.
LSA-C.E. art. 404B(1) provides:
[E]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
*507 The admissibility of such evidence is dependent on three things: 1) the factors listed in Article 404B must be at issue and have some independent relevance, 2) the State must prove defendant committed the other acts by clear and convincing evidence, and 3) the requirements of Prieur[8] must be met. State v. Miller, 98-301 (La.9/9/98), 718 So.2d 960, 962. Even if independently relevant, the evidence may be excluded if its probative value is substantially outweighed by the dangers of unfair prejudice, confusion of the issues, misleading the jury, considerations of undue delay or waste of time. LSA-C.E. 403.
Clearly, evidence of other crimes or bad acts will no doubt be prejudicial since all evidence which tends to make it more probable than not that an individual committed a criminal offense is necessarily prejudicial. State v. Dickerson, 00 951 (La.App. 5 Cir. 11/2/00), 772 So.2d 845, 852, writ denied, State ex rel. Dickerson v. State, 00-3515 (La.8/31/01), 795 So.2d 1209. However, as the Louisiana Supreme Court explained in State v. Humphrey, 412 So.2d 507, 520 (La.1981), the underlying policy is not to prevent prejudice, since evidence of other crimes is always prejudicial, but to protect against unfair prejudice when the evidence is only marginally relevant to the determination of guilt of the charged crime.
A trial court's ruling on the admissibility of evidence pursuant to LSA-C.E. art. 404B(1) will not be disturbed absent an abuse of discretion. State v. Richard, 01-952 (La.App. 5 Cir. 1/29/02), 807 So.2d 1129, 1136.
Throughout the trial, various references were made to the defendant's and the victims' involvement in gangs. A gang expert testified about gang culture and their signs and language. Defendant objected at every junction on the basis it was irrelevant evidence of other crimes or bad acts. The trial court overruled the majority of defendant's objections and allowed testimony and evidence pertaining to the parties' involvement in gangs. A photo album containing pictures of defendant and others was allowed into evidence. On appeal, defendant complains of the testimony of the gang expert that the people in the picture, including defendant, are flashing Crip gang signs and disrespecting Blood signs.
The Second Circuit has noted that
[i]n today's society, members of gangs are not regarded as model citizens. There is an inherent connotation that a gang member is involved in criminal activity. The fact that [a] defendant was a gang member could ... create an image of a bad person in the eyes of the jury.
State v. Barnes, 28,835 (La.App. 2 Cir. 12/11/96), 685 So.2d 1148, 1155. In Barnes, the court determined that evidence of the defendant's gang affiliation was prejudicial because the evidence was not relevant to any of the essential elements of the armed robbery. However, the court concluded the error was harmless.
Unlike armed robbery, second degree murder is a specific intent crime. In the present case, defendant's gang affiliation had independent relevance in establishing defendant's motive and intent.
In State v. Gibson, 99-2827 (La.App. 4 Cir. 4/11/01), 785 So.2d 213, 221, writ denied, 01-1458 (La.4/19/02), 813 So.2d 418, the Fourth Circuit found that evidence of a prior shooting was admissible to show defendant's motive in a subsequent drive-by shooting. The court noted the apparent *508 motive for the subsequent drive-by shooting was an earlier altercation between the parties.
In the present case, the evidence showed the shooting was gang-related. There was evidence of a territorial conflict between the Crips and Bloods. The evidence showed gangs members would "throw up signs" some of which were disrespectful to the opposing gang. Defendant's affiliation with the Crip gang and his use of gang hand signs was relevant to show his motive to specifically injure the victims, who were affiliated with a rival gang, the Bloods.
Moreover, even assuming that the evidence of gang culture was improperly admitted, reference to evidence of other bad acts is subject to the harmless error rule. The test for determining harmless error is whether the verdict actually rendered in the case was surely unattributable to the error. State v. Richard, 807 So.2d at 1137. The State presented evidence that identified defendant as one of the perpetrators of the crime. Considering this evidence, the testimony that defendant was a gang member would not have contributed to his guilty verdict.

ERROR PATENT DISCUSSION
The record was reviewed for errors patent, according to LSA C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990). The following matter was discovered:
While the minute entry shows that defendant was advised of the prescriptive period for post-conviction relief pursuant to LSA-C.Cr.P. art. 930.8, the transcript does not. Where there is a discrepancy between the transcript and the minute entry, the transcript prevails. State v. Lynch, 441 So.2d 732, 734 (La.1983). Thus, the trial court is hereby instructed to inform defendant of the two-year prescriptive period by sending written notice to defendant within ten days after the rendition of the appellate opinion and to file written proof in the record that defendant received such notice. State v. Cordero, 99-44 (La.App. 5 Cir. 6/1/99), 738 So.2d 84, 93, writs denied, 99-1877 and 99-1878 (La.11/24/99), 750 So.2d 981.

DECREE
Accordingly, for the reasons assigned herein, the conviction and sentence of defendant, Mervyn Williams, is affirmed. The case is remanded to the trial court with instructions for the trial court to inform the defendant of the prescriptive provisions for seeking post-conviction relief pursuant to La. C.C.P. art. 930.8.
AFFIRMED; CASE REMANDED WITH INSTRUCTIONS.
NOTES
[1] Of some note, the charges against co-defendant Steven Bailey were dismissed on September 21, 1999.
[2] The record uses different spellings of Brian Payne: "Brian" and "Bryan" and "Payne" and "Pane".
[3] As discussed infra in detail, Peter Rodrigue did not testify in person at the second trial. His tape-recorded testimony from the first trial was played into evidence at the second trial. The trial court followed along with a transcript of the recorded testimony. Although the trial court asked that a copy of the transcript be marked and made a part of the record, it was not. However, a transcript of Rodrigue's trial testimony was used as an exhibit during a hearing on the State's motion to use prior testimony and is included in the record.
[4] Since defendant has only alleged the State failed to prove he was the perpetrator of the crime, we need not address the sufficiency of the evidence with respect to the statutory elements of second degree murder.
[5] Writs in the Cowart case were filed with the Louisiana Supreme Court on May 24, 2002, No.2002-KO-1457, but no ruling had been rendered as of the date of this opinion.

In Cowart, only one witness identified the defendant as the perpetrator of the shooting and there was no physical evidence linking defendant to the crime. The defendant attacked the reliability of the witness' identification arguing the witness was a convicted felon, had received psychiatric care, had initially lied to the police about witnessing the murder, perjured herself during motion hearings and changed her story about the location and lighting of the crime scene and the number of shots she heard. Additionally, the defendant argued the physical descriptions of the suspects seen fleeing the scene varied from his physical description.
This Court determined the witness had not perjured herself and that she rationally explained why she initially lied to the police. This Court further concluded the various discrepancies among testimony and changes in the key witness' story were inconsequential. This Court also explained that it was within the jury's discretion to believe the witness' testimony despite her prior conviction and psychiatric treatment.
[6] All three defendants were tried together in the first trial and each was represented by separate counsel, all who conducted their own cross-examinations of Rodrigue.
[7] A transcript of the hearing on the motion in limine is missing from the appellate record. However, the minute entry shows the trial court denied the motion in limine on March 26, 1999.
[8] State v. Prieur, 277 So.2d 126 (La.1973).