# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 14-436

STATE OF LOUISIANA

VERSUS

WILLIAM FELIX VAIL

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 16994-13
HONORABLE ROBERT LANE WYATT, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## JOHN D. SAUNDERS
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of John D. Saunders, Billy Howard Ezell, and Phyllis M. Keaty, Judges.

### WRIT DENIED.

**John Foster DeRosier**
**14th JDC District Attorney**
**Carla Sue Sigler**
**Assistant District Attorney**
**P. O. Box 3206**
**Lake Charles, LA 70602-3206**
**(337) 437-3400**
**COUNSEL FOR PLAINTIFF/RESPONDENT:**
    **State of Louisiana**

**Hugo A. Holland  Jr.**
**Assistant District Attorney**
**501 Caddo Parish Courthouse**
**Shreveport, LA 71101-0000**
**COUNSEL FOR PLAINTIFF/RESPONDENT:**
     **State of Louisiana**

**Benjamin A. Cormier**
**Attorney At Law**
**827 Pujo Street**
**Lake Charles, LA 70601**
**(337) 564-6863**
**COUNSEL FOR DEFENDANT/APPLICANT:**
     **William Felix Vail**

**SAUNDERS, Judge.**

Defendant, William Felix Vail, was indicted for the 1962 second degree murder of his wife, Mary Horton Vail, a violation of La.R.S. 14:30.1. On November 13, 2013, the State filed a "404(B) Notice," wherein it advised Defendant that it intended to introduce at trial evidence of the 1973 disappearance of his then-girlfriend, Sharon Henley, and the 1984 disappearance of his second wife, Annette Carver-Vail. On the same date, the State filed a "Memorandum in Support of State's 404(B) Notice." On January 31, 2014, the State filed a "Post-Hearing Memorandum in Support of State's 404(B) Notice," with exhibits. On March 5, 2014, Defendant filed a "Post-Hearing Memorandum in Opposition to the State's 404(B)," with exhibits. On March 6, 2014, the State filed a rebuttal to Defendant's opposition entitled "Post-Hearing Memorandum in Support of State's 404(B) Notice."

On March 19, 2014, the trial court heard oral arguments regarding the State's intent to introduce evidence of the disappearances of Ms. Carver-Vail and Ms. Hensley, following which the trial court ruled in favor of the State. Defendant sought review of the trial court's ruling.

On its own motion, this court called the matter up for oral argument to be heard on September 24, 2014. Thereafter, both the State and Defendant filed briefs in addition to those initially filed for and against the writ application.

**FACTS:**

Defendant's first wife, Mary Horton Vail, died in October 1962. Defendant claimed he and his wife were out boating one night on the Calcasieu River when she fell overboard, and he was unable to save her from drowning. At the time, the coroner for Calcasieu Parish determined that the manner of death was accidental

and the cause of death was drowning. Thereafter, a grand jury pretermitted the case as the it did not find sufficient evidence that the death was not accidental as found by the then-coroner.

However, on an unspecified recent date, Doctor Terry Welke, the current coroner for Calcasieu Parish and an expert in forensic pathology, examined pictures of Ms. Vail's body as it was being pulled out of the river and reviewed the coroner's report made shortly thereafter. At a preliminary hearing, Doctor Welke testified that although he could not determine the cause of Mrs. Vail's death, the manner of death was a homicide.

## FACTS PERTAINING TO EVIDENCE OF OTHER WRONGS OR ACTS:

Sharon Hensley and Defendant met in San Francisco, California, sometime in the late sixties. They were arrested in Merced County for drug possession and child endangerment. In March 1974, Defendant wrote to Ms. Hensley's mother and advised her that in 1973, he last saw Sharon in Florida, where she had boarded a sailboat with another couple and sailed away to cruise the world. No one in Ms. Hensley's family has heard from her since. Ms. Hensley's brother filed a missing person's report in 2013.

Ms. Carver-Vail met Defendant when she was fifteen and he was forty-one. They married in 1983 when she was seventeen. In August 1984, Ms. Carver-Vail deeded her interest in property she inherited from her father in Oklahoma to Defendant in fee simple. In October of that year, Ms. Carver-Vail's mother filed a missing person's report on her daughter. Defendant advised the police that on September 19, 1984, he dropped Ms. Carver-Vail off at a bus station in St. Louis. He stated her intent was to go to Mexico. Ms. Carver-Vail has not been seen or heard from since by anyone who has come forward.

## ISSUE:

Defendant argues that the trial court erred when it ruled that evidence of the two women's disappearances was admissible at trial "when the State failed to present evidence of the alleged acts and the hunches and speculations that was [sic] offered in support of the State's argument are [sic] overly prejudicial and not allowed under Rule of Evidence 403." He further argues:

> That the District Court erred as a matter of law by ruling that Sharon Hensley and Annette Carve[r] Vail could be presumed dead and that the Defendant could be presumed to be the one who killed them since he was the last person the District Court knew that had contact with the two women. That the District Court erred in [sic] a matter of law in its application of the doctrine of chances. And that the District Court erred as a matter of law when the District Court presumed that the reason there was no evidence to suggest that a crime took place, or that the [D]efendant was involved in the commission of a crime in regards to Sharon Hensley and Annette Carver Vail was because the Defendant spent years planning and executing the murders, rather and [sic] concluding that a complete lack of evidence meant the Defendant was not guilty of murdering Annette Carver Vail and/or Sharon Hensley.

## ANALYSIS:

Louisiana Code of Evidence Article 404 provides, in pertinent part:

> **B. Other crimes, wrongs, or acts.** (1) Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.

Even conduct which occurred after the charged offense may be admissible pursuant to Article 404(B). *State v. Lee,* 05-2098 (La. 1/16/08) 976 So.2d 109. *See also State v. Altenberger*, 13-2518 (La. 4/11/14), 139 So.3d 510, *cert. denied*, 555

3

U.S. 824, 129 S.Ct. 143 (2008). Furthermore, it is the State's burden to prove that a defendant committed the other crimes, wrongs, or acts by clear and convincing evidence. *State v. Prieur*, 277 So.2d 126 (La.1973); *State v. Stevens,* 11-175 (La.App. 3 Cir. 10/5/11), 74 So.3d 803, *writ denied*, 11-2496 (La. 3/30/12), 85 So.3d 115. However, La.Code Evid. art. 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time."

In its "Memorandum in Support of State's 404(B) Notice," the State argued that evidence of the disappearances of the two women was admissible for the purpose of showing absence of mistake or accident. Defendant contended that his first wife's death was accidental. Referring to *State v. Monroe*, 364 So.2d 570, 572 (La.1978), quoting from 2 Wigmore on Evidence, § 302 (3d. 1940), the State argued that the "'doctrine of chances' eliminates the element of innocence by multiplying instances of the same results until it is perceived that this element cannot explain them all." Defendant claimed that no action on his part caused his first wife's death or the disappearance of his girlfriend, eleven years after the death of the wife, or the disappearance of his second wife, also eleven years after the disappearance of Ms. Hensley. The State argued that to have lost a wife, allegedly to an accident, then to have two other significant women in his life disappear under suspicious circumstances indicated that the death of his first wife may possibility not have been accidental. Again quoting 2 Wigmore on Evidence, § 302 (3d. 1940), the State argued that "similar results do not usually occur through abnormal causes; and the recurrence of a similar result tends increasingly with each instance to negate accident or inadvertence."

4

In its "Post-Hearing Memorandum in Support of State's 404(B) Notice," the State speculated that Defendant had a reason to dispose of Ms. Hensley. When they were in California, they had Defendant's eight-year-old son, Billy Vail, with them. The couple was arrested after the boy walked into a police station one day and told the police he was tired of living in an orchard, eating only grapes, and being force fed drugs. He also told them that he had overheard his father tell Ms. Hensley that he murdered his wife. This prompted a renewal of the investigation into Mrs. Vail's death in Lake Charles. According to the State, years later, Billy Vail made a taped statement but died shortly thereafter. The State claims to have a copy of the tape; however, the tape was inadmissible at trial.

According to Defendant, after Ms. Hensley got out of jail in California, she wanted to go off on her own. He wrote a letter to Ms. Hensley's mother explaining her disappearance. He noted in the letter that Ms. Hensley's mother had contacted his mother in an attempt to locate Ms. Hensley. He told Ms. Hensley's mother that her daughter wanted to disappear and start her life over again, mostly to get away from her. He wrote that they had met a couple in Florida who wanted to take them away on a world cruise on a sailboat. He knew only the couples' first names and had no information regarding the sailboat's name or registration. While he professed his love for Ms. Hensley, he stated he did not want to go on the trip, so she decided to leave him.

In the memorandum, the State reproduced, in part, a letter Defendant sent to his parents on March 20, 1973, telling them about Ms. Hensley's disappearance:

> I'm not married anymore and although she has just been gone two days my thinking is starting to clear from the clouds that were in her mind. I saw them there from the time she got us busted in California and I thought I could get her clear but I've given up the experiment (with her anyway) so now I can began training full time. . . . One

more thing about my last wife (for your own information and in case her folks inquire) she met a man who has a boat and although he invited us both, I convinced them I have more pressing things to do at the moment, and so, I sent them off to the ocean and each other with my good wishes and blessing (and, I might add, all to my great relief.).

The State speculated here that once Ms. Hensley had indicated she wanted out of the relationship, it was to his benefit to dispose of her somehow since he had confessed to her that he murdered his wife, and when she was out of his control and domination, she could corroborate his son's story that he had confessed to her. Although there was some investigation as to her whereabouts, Ms. Hensley's family never saw or heard from her again, nor was there any social security activity reported.

Defendant further argued that Sharon Hensley was a rebellious hippie whose disappearance was not a surprise to her family. He pointed to a letter her mother supposedly wrote to investigators regarding her daughter wherein she described her daughter's behavior after she had met Defendant. Defendant pointed out that the family did not report Ms. Hensley missing until several years later at the State's prompting. He stated that she had independently told her family that she was leaving on a boat to travel the world. However, in the same above-mentioned letter, Ms. Hensley's mother stated that the very last time she had any communication with her daughter was when she called from Defendant's sister's house on February 3, 1973, and told her mother that she and Defendant were on their way to New Orleans. He further argued that there was no evidence that he even knew of the confession he allegedly made to Ms. Hensley or that the investigation into his wife's death had been reopened in Lake Charles; therefore, there was no reason to be rid of her.

Defendant's second wife, Annette Carver-Vail, was reported missing, and as late as 1994, a social security check indicated no income contributions under her social security number since 1973. Defendant first met Annette Carver when she was fifteen years old in Houston, Texas. They were married August 15, 1983, when he was forty-three and she was seventeen. When she turned eighteen, she received one hundred thousand dollars from a trust fund established by insurance proceeds from the death of her father several years earlier. She also inherited some realty. In 1982, allegedly using some of the funds from the trust, her mother purchased property in her and Annette Carver's name in Tulsa, Oklahoma. In May 1984, Ms. Carver-Vail's mother deeded her interest in the property to her daughter. On August 28, 1984, Ms. Carver-Vail deeded the property over to Defendant in fee simple. According to Defendant, in September 1984, he drove his wife to a bus station in St. Louis, Missouri, and dropped her off. He told the investigators she planned to travel to Denver first to obtain false identification and then on to Mexico. He also claimed that she took most of the cash they had left from her inheritance, about fifty thousand dollars, but left him ten thousand dollars for needed repairs on the house.

The State pointed out, however, that the Tulsa police investigation led to Defendant's sister, Sue Jordan, who told the investigators that in October 1984, Defendant and Ms. Carver-Vail showed up at her house in Lake Charles. They attended the Cal-Cam fair. The date of the fair was verified by the investigator. A few days after the fair, Defendant and Ms. Carver-Vail left, but he returned a few days later by himself and said that Ms. Carver-Vail had gone to Mexico. Later, Ms. Jordan denied telling the investigators that Ms. Carver-Vail did not return with Defendant. Ms. Jordan has subsequently died. The State contends it has a witness

7

who will testify to the foregoing facts should the evidence of Ms. Carver-Vail's disappearance be admitted at trial.

In its memorandum, the State concluded:

> Vail's story in relation to the two presumed dead women is shockingly similar in many respects, the most important of course being that both Sharon and Annette, who never met one another and who are separated by both time and space, decided independently of each other and independently of Felix Vail that they each needed to shed all contact with their current lives, leaving behind parents and siblings and all that they had ever known and loved, to become new people, clean and free from memory associations and to drop everyone and start over.

In his "Post-Hearing Memorandum in Opposition to the State's 404(B) Notice," Defendant argued that all of the State's allegations were solely assumptions and not based on any physical evidence that he was involved in the two women's decisions to sever all ties with their families and friends. He claimed he had conversations with Ms. Carver-Vail a few years after her departure and that she had called him to tell him she was well and had children. He claimed that he went to Mexico at some point to look for her. He stated that Ms. Carver-Vail had a boyfriend in Mexico at one time, which her mother verified in her reports to the investigating police officers. He further pointed out that there were significant indications that six months after she left, she appeared in court in Claremore, Oklahoma, and pled guilty to a reduced charge of malicious destruction of property.

The State countered that while it had procured documents which indicated that Ms. Carver-Vail was in Claremore, Oklahoma, in court six months after Defendant insisted she left for Mexico, the documents showed that he had been charged with the same offense and was in court that day also. The State argued that neither Defendant nor Ms. Carver-Vail were actually in court and that their attorney waived their appearances and entered pleas for them. The State further

8

argued that if the facts were otherwise, Defendant would have told investigators about seeing her after she reportedly left for Mexico. However, over the years, Defendant never said a word about it, only telling investigators sometime in the 1990's that she had called him within a year or two of disappearing to Mexico.

In his memorandum, Defendant also pointed to and discussed *Monroe*, 364 So.2d 570, and quoted Wigmore regarding the "doctrine of chance." He stated that pursuant to Wigmore, the doctrine required that the evidence sought to be admitted as prior "acts" must be similar in incidents and results and must be committed within a limited time period. He argued that there was no similarity between the death of his first wife and Ms. Hensley's or Ms. Carver-Vail's riddance of their family and friends for a new life. Defendant further argued eleven years and twenty-two years after the underlying alleged crime was not "within a limited time frame" as required by the doctrine.

In *Monroe*, the defendant was convicted of the strangulation death of an elderly man. He admitted he strangled the man and admitted to strangling another man to death the next day. However, he claimed self-defense in both cases. On appeal, he argued that evidence of the subsequent offense was not admissible because it did not show sufficient probative value to outweigh its prejudicial effect. The supreme court held:

> Because the introduction of evidence of other acts of misconduct involves substantial risk of grave prejudice to a defendant, evidence of crimes related to the offense with which a defendant is charged is inadmissible except under special exceptions. *State v. Prieur,* 277 So.2d 126 (La.1973). The general rule is that the prosecution may not introduce evidence of other criminal acts of the accused unless the evidence is substantially relevant for some other purpose than to show a possibility that he committed the crime on trial because he is a man of criminal character. *State v. Sutfield,* 354 So.2d 1334 (La.1978). One of the other purposes for which such evidence may be relevant is to show, by the similar offense, that the act on trial

9

was not inadvertent, accidental, unintentional, or without guilty knowledge. *McCormick on Evidence*, § 190 at p. 450 (Cleary ed. 1972); La.R.S. 15:455, 456. However, in order for such evidence to be admissible to prove intent, or for another permissible purpose, there must be a real and genuine contested issue of intent at trial; *State v. Nelson,* 357 So.2d 1100, 1103 (La.1978); *State v. Prieur, supra,* and the probative value of the evidence must outweigh its prejudicial effect. *State v. Sutfield, supra*, *State v. Prieur, supra.*

The reasons underlying the exception for proof of intent when genuinely at issue and the prerequisites to its application were set forth by Wigmore, who observed:

"To prove Intent, as a generic notion of criminal volition or wilfulness, including the various non-innocent mental states accompanying different criminal acts, there is employed an entirely different process of thought. The argument here is purely from the point of view of the doctrine of chances, the instinctive recognition of that logical process which eliminates the element of innocent intent by multiplying instances of the same result until it is perceived that this element cannot explain them all. Without formulating any accurate test, and without attempting by numerous instances to secure absolute certainty of inference, the mind applies this rough and instinctive process or reasoning, namely, that an unusual and abnormal element might perhaps be present in one instance, but the oftener similar instances occur with similar results, the less likely is the abnormal element likely to be the true explanation of them.

"***

"A. In short, similar results do not usually occur through abnormal causes; and the recurrence of a similar result (here in the shape of an unlawful act) tends (increasingly with each instance) to negative accident or inadvertence or self-defense or good faith or other innocent mental state, and tends to establish (provisionally, at least, though not certainly) the presence of the normal, i. e., criminal, intent accompanying such an act; and the force of each additional instance will vary in each kind of offence according to the probability that the act could be repeated, within a limited time and under given circumstances, with an innocent intent. ***

"***

"It will be seen that the peculiar feature of this process of proof is that the a*ct itself is assumed to be*

*done*, – either because (as usually) it is conceded, or because the jury are instructed not to consider the evidence from this point of view until they find the act to have been done and are proceeding to determine the intent. This explains what is a marked feature in the rulings of the Courts, namely a disinclination to insist on any feature of common purpose or general scheme as a necessary requirement for the other acts evidentially used. It is not here necessary to look for a general scheme or to discover a united system in all the acts; the attempt is merely to discover the intent accompanying the act in question; and the prior doing of other similar acts, whether clearly a part of a scheme or not, is useful as reducing the possibility that the act in question was done with innocent intent. The argument is based purely on the doctrine of chances, and it is the mere repetition of instances, and not their system or scheme, that satisfies our logical demand.

"Yet, in order to satisfy this demand, it is at least necessary that prior acts should be *similar*. Since it is the improbability of a like result being repeated by mere chance that carries probative weight, the essence of this probative effect is the likeness of the instance. ***

"In short, there must be a similarity in the various instances in order to give them probative value – , as indeed the general logical canon requires (ante, § 33)." 2 Wigmore on Evidence, § 302 (3d ed. 1940).

Applying the relevant principles to the instant case we conclude that the trial judge properly invoked the exception and allowed the introduction of the similar offense evidence to negate self defense and lack of intent. There was little if any doubt that the defendant had killed Ulysses Martin. However, a real and genuine issue as to his specific intent to kill or cause great bodily harm, which the State had the burden of proving, La.R.S. 14:30.1, was raised by the evidence of self defense and insanity. The evidence of the subsequent act, which was strikingly similar, had great probative value to show the improbability that the defendant acted in self defense or without requisite intent in strangling two derelicts on successive nights at the same spot on the river batture.

*Monroe*, 364 So.2d at 572-73.

At the hearing, held on March 19, 2014, the State and Defendant presented the trial court with the arguments set forth in their memorandums. Defendant further argued that the State was attempting to divest him of the presumption of innocence by suggesting through the admission of the long-time disappearances of Ms. Hensley and his second wife the presumption that they were dead. According to Defendant, if the trial court presumed the women were dead, then it was shifting the burden of proving that they were alive onto Defendant. He argued the burden of proving that he had committed other crimes for the purpose of La.Code Evid. 404(B) was on the State. He argued that if the State was allowed to put on evidence of the two women's disappearance at trial, he would be required to prove that they were still alive, and that he cannot do. Defendant contends that he will be extremely prejudiced by having to also defend against two presumed murders.

The State further argued that it can clearly and convincingly prove by circumstantial evidence that Defendant was the last person to ever see or hear from the two missing women and that the circumstantial evidence would also show the bizarrely similar circumstances under which the women disappeared. The State suggested that Defendant did not understand the "doctrine of chances" requirements. *See* 2 Wigmore on Evidence, §302 (3d ed. 1940). The "doctrine of chances" required only that the results were similar but not necessarily the mechanism by which the results were reached. Finally, the State argued that the trial court, for the purpose of deciding the issue of whether the evidence was allowable and not overly prejudicial, could presume the women were dead without violating Defendant's right to be presumed innocent. The State pointed out that one was presumed competent to proceed to trial. "Because we presume competence

12

and not incompetence, does that somehow mean that we violated the defendant's constitution right?'"

The trial court then ruled, as follows:

It appears that the only undisputed matter of issue, whether this Court should allow reference and introduction of the evidence of other bad acts at this defendant's trial for murder of his wife, Mary, is that this particular fact scenario or situation is obviously very novel in the state of Louisiana. The bad acts sought to be introduced by the State are incidences, if you will, of events that are alleged to have taken place not only subsequent to the death of Mary Vail in October 1962 but many years, hence, the latter of them occurring some 22 years later. Add to that, the issue that the incidences, again, if you will, of bad acts are of great, great questionable dispute.

Though it may well be argued that both of the subsequent incidences involved the wife or significant other of Mr. Vail and by operation of law are presumed dead, neither of the bad acts resulted in criminal charges being brought against Mr. Vail, and I concede that. As to the presumption of death, the only applicable statute that addresses this circumstance appears to be Louisiana Civil Code Article 30, which states in pertinent part, "when a person has disappeared under circumstances such that the death seems certain, his death is considered to have been established even though no body has been found." Combine that with Civil Code Article 54 that sets that period of time legally at five years, and obviously we're beyond that five years on both of those by many, many years.

As to the issue of certainty of the death of Sharon Hensley, again, without chronicling the entirety of the State's brief regarding that disappearance, it appears to be fairly well documented and determined that the last person of any relation to her - - to see, hear, or speak with her is Mr. Vail. Now, if it's - - by his own admission, Sharon Hensley did embark on that sailing vessel and has not been heard from or seen since that day, she may well be now some 40 years later presumed dead. Secondly, his second wife, Annette Carver Vail, again by Mr. Vail's own words, was last seen by any reporting person in St. Louis, Missouri on or about September 15, 1984, that separation approaching 30 years now.

The State argues that it should be allowed to admit to the trier of fact these two instances of uncharged misconduct evidence not to prove intent but to prove the absence of mistake or accident. The analysis for admitting this uncharged misconduct is drawn by applying the Doctrine of Chances or probability theory or - - probability theory. Evidence of other similar happenings that might be only marginally probative if considered in isolation can become

highly probative when considered in conjunction or collectively or as in repeated instances.

The defense argues that the acts to be considered need to be similar with similar outcomes. I recognize that. There is some dispute or uncertainty as to the element but even allowing for this contended requirement, similarity recognized by the Court is the elimination of a spouse or a significant other. There's no dispute that Mary Vail was deceased. And as indicated earlier in this discussion, this Court is assuming, at least until determined otherwise, that the other two women of interest are deceased, also.

The defendant next argues that this same Doctrine of Chances requires that the act take place within a limited time, not 11 or 22 years after the demise of Mary Vail. It is conceded that 11 and 22 years after a certain event are significant periods of time, and I recognize that.

However, the act or acts that question here are substantially and arguably the most egregious possible and their very substance suggests years of nurturing and preparation. In other words, these acts are not shoplifting or even burglaries. The enormity of their consequences are time-consuming events. By their nature - - very nature, they take time.

Lastly, the defendant would argue that the acts actually occurred, would dispute that those actually occurred as they pled previously. This Court at this time is presuming that Sharon Hensley and Annette Craver Vail are deceased and under questionable circumstances. By Mr. Vail's own words, he is the last person of interest to see either of these two women alive, at least until someone else reveals to this Court or a trier of fact to the contrary.

The analysis up to this point by the Court leads it to rule that these two instances of disappearance and likely deaths are admissible at the trial of Felix Vail for the murder of Mary Vail.

Now, defense has suggested that the Court consider Article 403 of the Code of Evidence, which addresses the prejudicial nature of the evidence otherwise relevant. We still have to go through that. The article states in pertinent part that although relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. I have already determined that the probative value of the prior acts is a material issue.

Other than character, no doubt the revelation - - revelation of these acts to a jury would create an effective suspicion of guilt as it relates to the defendant, or the State would have no interest in disclosure. However, this Court believes that the probative value to

14

the trier of fact outweighs the unfair prejudice. Concerns of unfair prejudice can be alleviated by limiting jury instructions at trial.

As briefly noted above, in order for other crimes evidence to be admitted under La. Code Evid. art. 404(B)(1), one of the factors in the article must be at issue, have some relevance, or be an element of the crime charged. *State v. Jackson*, 93-424 (La. 10/18/93), 625 So.2d 146. Further, the probative value of the extraneous evidence must outweigh its prejudicial effect. La.Code Evid. art. 403. However, as noted by the fifth circuit:

> Evidence of other crimes or bad acts is prejudicial since all evidence which tends to make it more probable than not that an individual committed a criminal offense is necessarily prejudicial. *State v. Williams*, 02-645, p. 16 (La.App. 5 Cir. 11/26/02), 833 So.2d 497, 507. However, the underlying policy is not to prevent prejudice, since evidence of other crimes is always prejudicial, but to protect against unfair prejudice when the evidence is only marginally relevant to the determination of guilt of the charged crime. *Id.*

> The defendant bears the burden to show that he was unfairly prejudiced by the admission of the other crimes evidence. [*State v.*] *Dauzart*, 02-1187 at 9, [(La.App. 5 Cir. 10/27/09)] 844 So.2d [159] at 165-66. Absent an abuse of discretion, a trial court's ruling on the admissibility of this evidence will not be disturbed. *State v. Merritt*, 04-204, p. 11 (La.App. 5 Cir. 6/29/04), 877 So.2d 1079, 1085, *writ denied*, 04-1849 (La.11/24/04), 888 So.2d 228.

*State v. Davis*, 12-512, p. 20 (La.App. 5 Cir. 4/24/13), 115 So.3d 68, 80, *writ denied,* 13-1205 (La. 11/22/13), 126 So.3d 479.

We agree with the trial court that there is a real and genuine contested issue of intent at trial. Defendant has been accused of killing his first wife in 1962. He contended that his wife's death was accidental. The State argued that the evidence of the two women's disappearances was sufficiently probative to rebut Defendant's claim that he did not intentionally kill Mary Vail but that her death was accidental.

We acknowledge that there is very little in Louisiana jurisprudence that discusses "doctrine of chance," other than *Monroe*, 364 So.2d 570, which offers little guidance. In *State v. Galliano,* 02-2849 (La. 1/10/03), 839 So.2d 932, the defendant was convicted of cruelty to a juvenile for inflicting an injury similar to shaken baby syndrome on a two year old. He appealed the conviction, alleging that it was error for the state to introduce evidence that the child's leg was broken a few months prior to the current incident when the defendant took him out of a child car seat. He argued that incident was accidental and served only to prejudice the jury against him. The supreme court held:

> The district court properly invoked the exception in LSA-C.E. 404(B)(1) and allowed the introduction of the other acts evidence to negate defendant's claims of accident, mistake and lack of intent. The evidence of the prior incident in which the victim sustained a broken femur when defendant pulled him forcefully from his car seat has probative value to show the improbability that the defendant acted without the requisite intent, or accidentally, when he, according to his own admission, shook the victim in the instant situation "to get his attention." *See, State v. Monroe*, 364 So.2d 570 (La.1980) (under doctrine of chances, likelihood that defendant was required to kill twice in self defense on successive nights at the same location was so remote that evidence of the other killing was admissible to negate self defense and lack of intent). Under the particular circumstances of this case, although evidence of the prior incident is clearly prejudicial, we cannot say that it is so inflammatory as to create an unacceptable risk of luring jurors "into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief v. United States*, 519 U.S. 172, 180, 117 S.Ct. 644, 650, 136 L.Ed.2d 574 (1997). The court of appeal erred in holding to the contrary.

*Id.* at 934.

While not binding on this court, a Michigan Supreme Court case, *People v. Mardlin,* 487 Mich. 609, 790 N.W.2d 607 (2010), discussed the "doctrine of chances" at length. In *Mardlin*, the defendant was convicted of arson of a dwelling house and burning insured property. On appeal, he argued that his home

16

accidentally burned down; therefore, it was error to allow evidence admitted at trial of four previous home or vehicle fires, which occurred over the past twelve years and also involved insurance claims. The appellate court had concluded that the evidence was irrelevant, inadmissible, and improperly prejudicial. However, the Michigan Supreme Court examined the evidence in light of the "doctrine of chances." It explained:

> The doctrine of chances—also known as the "doctrine of objective improbability"—is a "'theory of logical relevance [that] does not depend on a character inference.'" Under this theory, as the number of incidents of an out-of-the-ordinary event increases in relation to a particular defendant, the objective probability increases that the charged act *and/or* the prior occurrences were not the result of natural causes. The doctrine is commonly discussed in cases addressing MRE 404(B) because the doctrine describes a logical link, based on objective probabilities, between evidence of past acts or incidents that may be connected with a defendant and proper, noncharacter inferences that may be drawn from these events on the basis of their frequency. If a type of event linked to the defendant occurs with unusual frequency, evidence of the occurrences may be probative, for example, of his criminal intent or of the absence of mistake or accident because it is objectively improbably that such events occur so often in relation to the same person due to mere happenstance.

*Id*. at 6132-13 (footnote omitted).

In *Mardlin*, the Michigan Supreme Court held that the appellate court "erred by incorrectly assuming that evidence of the past fires could only be admitted if the prosecutor proved that defendant intentionally set them or that they shared other special qualities or additional significant indices of similarity." *Id.* at 614. The court noted that the appellate court's blanket conclusion that a key factor of the doctrine of chance was that the past incidents must be similar to the charged offense was incorrect. The Michigan Supreme Court went on to state:

> To the contrary, application of the doctrine of chances "varies with the issue for which it is offered." As with all arguments involving prior acts or events, the "method of analysis to be employed

17

> depends on the purpose of the offer and its logical relevance." The acts or events need not bear striking similarity to the offense charged if the theory of relevance does not itself center on similarity.

*Id.* at 614-15(footnote omitted).

In the current case, the events the State desires to introduce need not "bear striking similarity" to the charge of second degree murder of Defendant's wife. *Id.* at 614-15. In this case, the relevance does not center on similarity of the act but on the results. Defendant's first wife is dead. Two other significant women in Defendant's life, Ms. Hensley and Ms. Carver-Vail, have not being seen in forty-one and thirty years, respectively. In all three incidences, Defendant allegedly was the last person to ever see them alive. Defendant's explanation that the latter two women desired to be rid of their domineering mothers to show that he had not motive to kill them, does not pertain to the admissibility analysis in this case.

Defendant further argues that the trial court erred when it by passed the "doctrine of chances" requirement that the bad acts evidence take place within a limited period of time by taking "the extraordinary step of presuming the murders took years of planning, scheming, and nurturing to execute when there is no evidence the women were even murdered is painfully simple." While the trial court's handling of the matter of remoteness between the death of Defendant's first wife and the subsequent disappearance of the two women was less than ideal, the length of time between the acts and the crime Defendant is being charged with should affect the weight of the evidence but not its admissibility. In *State v. Crawford*, 95-1352, p. 19 (La.App. 3 Cir. 4/3/96), 672 So.2d 197, 208-09, *writ denied*, 96-1126 (La. 10/4/96), 679 So.2d 1379, quoting *State v. Jackson*, 625 So.2d 146, 151 (La.1993), the third circuit explained:

18

We find that the time between the other crimes evidence and the offense charged is but one factor to be considered when balancing probative value, prejudicial effect and relevancy. Length of time between the offenses should not exclude otherwise admissible evidence unless the lapse strips the testimony of probative value. While there must be some connexity between the crime charged and the other acts or crimes, the mere passage of time will not necessarily defeat admissibility. However, such a determination must be made on a case by case basis taking into account the peculiar facts of every individual case with much discretion given to the trial judge. *State v. Cupit,* [189 La. 509, 179 So. 837 (1938)] *supra; State v. Driggers, supra* [554 So.2d 720 (La.App. 2 Cir. 1989) ].

As for Defendant's assertion that he is being prejudiced by the presumption that Ms. Hensley and Ms. Carver-Vail are dead, in brief, the State cites La.Civ.Code art. 30 which provides that "[w]hen a person has disappeared under circumstances such that his death seems certain, his death is considered to have been established even though his body has not been found" and La.Civ.Code art. 54, which establishes that a person who has been absent for five years may be presumed and declared dead upon petition to the court by an interested party. The State argues:

In *Jones v. State,* through the Department of Health & Hospitals, 95-1130 (La.App. 3 Cir. 3/27/96), 671 So.2d 1074, the Third Circuit Court of Appeal applied the presumption of death in LSA-C.C. Art. 30 in a case much like this one, where "the circumstantial evidence presented negates any reasonable hypothesis" that Sharon Hensley and Annette [Carter] Vail are alive. *Jones*, 671 So.2d at 1078. Moreover, while admittedly rare, this is not the first Louisiana "no body" case. In *State v. Dorsey*, 34,977 (La.App. 2 Cir. 9/26/01), 796 So.2d 135, a defendant was convicted of second degree murder even where no body was found. Here, the State does not seek the [sic] convict the defendant of murder based on such evidence, but instead wants to admit other crimes evidence regarding two women married or dating this defendant who logically can only be considered dead.

We find that the lack of direct evidence that Defendant disposed of Ms. Hensley and Ms. Carver-Vail does not preclude or weigh against admission. To the contrary, Defendant's apparent lack of direct culpability weighs in favor of

19

admission because it minimizes impermissible negative inferences about his character. In this case, as noted above in *Mardlin*, 790 N.W. 2d at 619, "the evidence does not create the traditional intermediate inference about character or criminal propensities associated with established, past criminal acts or convictions." The burden is on the State to prove by clear and convincing evidence that there were other criminal acts performed by Defendant in this case that bear upon determination of the crime charged. While the evidence is prejudicial, this court concludes that there is little danger of unfair prejudice, confusion of the issue, or misleading of the jury.

Accordingly, we find that the trial court did not abuse its vast discretion when it ruled that the State would be permitted to introduce evidence of the disappearances of Ms. Hensley and Ms. Carver-Vail.

**DISPOSITION:**

We find no error in the trial court's March 19, 2014, ruling permitting the State to introduce evidence of the disappearances of Annette Carver-Vail and Sharon Hensley.

**WRIT DENIED.**